UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | Criminal No. 26-cr- 10133 |
|---|---|---|
| | ) | |
| v. | ) | Violations: |
| | ) | |
| (1)  PEDRAM FEJAL, | ) | Count One: Securities Fraud Conspiracy |
| | ) | (18 U.S.C. § 1349) |
| (2)  BRIAN FENSTERSZAUB, | ) | |
| | ) | Count Two: Securities Fraud Conspiracy |
| (3)  MARK FENSTERSZAUB, | ) | (18 U.S.C. § 371) |
| | ) | |
| (4)  SIMON FENSTERSZAUB, | ) | Count Three: Securities Fraud; Aiding and |
| | ) | Abetting |
| (5)  ILYA GAVRILOV, | ) | (18 U.S.C. §§ 1348 and 2) |
| | ) | |
| (6)  BARUCH IGAL HATANIAN, | ) | Count Four: Securities Fraud; Aiding and |
| | ) | Abetting |
| (7)  YISROEL HOROWITZ, | ) | (15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. |
| | ) | § 240.10b-5; 18 U.S.C. § 2) |
| (8)  GOD IZRAELOV, | ) | |
| | ) | Count Five: Money Laundering Conspiracy |
| (9)  DAVID MORADI, | ) | (18 U.S.C. § 1956(h)) |
| | ) | |
| (10)  NICOLO NOURAFCHAN, | ) | Counts Six through Eight: False Statements |
| | ) | (18 U.S.C. § 1001(a)(2)) |
| (11)  DAVID OSTROV, | ) | |
| | ) | Count Nine: Obstruction of Justice |
| (12)  YECHIEL SALZBERG, | ) | (18 U.S.C. § 1512(b)(3)) |
| | ) | |
| (13)  ABRAHAM SHILIAN, | ) | Count Ten: Obstruction of Justice; Aiding |
| | ) | and Abetting |
| (14)  GAVRYEL SILVERSTEIN, | ) | (18 U.S.C. §§ 1512(c)(1) and 2) |
| | ) | |
| (15)  JOSEPH SUSKIND, and | ) | Forfeiture Allegation: |
| | ) | (18 U.S.C. § 981(a)(1)(C) and |
| (16)  ROBERT YADGAROV, | ) | 28 U.S.C. § 2461(c)) |
| | ) | |
| Defendants | ) | Money Laundering Forfeiture Allegation: |
| | ) | (18 U.S.C. § 982(a)(1)) |
| | ) | |

INDICTMENT

At all times relevant to this Indictment:

<u>General Allegations</u>

1.    Victim Law Firm A ("Law Firm A"), headquartered in Illinois, was one of the largest corporate law firms in the world by revenue.

2.    Victim Law Firm B ("Law Firm B"), founded in California, was one of the largest corporate law firms in the world by revenue.

3.    Victim Law Firm C ("Law Firm C"), headquartered in Massachusetts, was one of the largest corporate law firms in the world by revenue.

4.    Victim Law Firm D ("Law Firm D"), headquartered in New York, was one of the largest corporate law firms in the world by revenue.

5.    Victim Law Firm E ("Law Firm E"), headquartered in New York, was one of the largest corporate law firms in the world by revenue.

6.    Victim Law Firm F ("Law Firm F"), headquartered in New York, was one of the largest corporate law firms in the world by revenue.

7.    Victim Investment Bank A ("Investment Bank A"), headquartered in New York, was a boutique investment bank.

8.    Defendant PEDRAM FEJAL lived in New York.

9.    Defendant BRIAN FENSTERSZAUB ("B. FENSTERSZAUB") lived in Florida.

10.    Defendant MARK FENSTERSZAUB ("M. FENSTERSZAUB") lived in Florida.

11.    Defendant SIMON FENSTERSZAUB ("S. FENSTERSZAUB") lived in New York and Florida.

12.    Defendant ILYA GAVRILOV lived in Russia.

13.    Defendant BARUCH IGAL HATANIAN lived in Florida.

14.    Defendant YISROEL HOROWITZ lived in Florida.

15.    Defendant GOD IZRAELOV lived in Russia, Israel, and the United States.

16.    Defendant DAVID MORADI lived in New York.

17.    Defendant NICOLO NOURAFCHAN lived in New York and California.  After graduating from Yale Law School in or about 2011, NOURAFCHAN became a licensed attorney in New York.  From in or about 2013 to in or about 2017, NOURAFCHAN worked as an attorney for Law Firm A.  From in or about 2019 to in or about 2021, NOURAFCHAN worked as an attorney for Law Firm B.  From in or about 2021 to in or about 2023, NOURAFCHAN worked as an attorney for Law Firm C.  As an attorney employed by Law Firm A, Law Firm B, and Law Firm C, NOURAFCHAN owed duties of loyalty, trust, and confidence to Law Firm A, Law Firm B, Law Firm C, and those firms' clients.

18.    Defendant DAVID OSTROV lived in New Jersey.

19.    Defendant YECHIEL SALZBERG lived in New York.

20.    Defendant ABRAHAM SHILIAN lived in New York.

21.    Defendant GAVRYEL SILVERSTEIN lived in Florida.

22.    Defendant JOSEPH SUSKIND lived in Florida.

23.    Defendant ROBERT YADGAROV lived in and was a licensed attorney in New York.

24.    CC-1 lived in and was a licensed attorney in New York.  CC-1 attended college with NOURAFCHAN and YADGAROV.  From in or about 2010 to in or about 2019, CC-1 worked as an attorney for Law Firm D.  From in or about 2021 to in or about 2025, CC-1 worked as an attorney for Law Firm E.  As an attorney employed by Law Firm D and Law Firm E, CC-1 owed duties of loyalty, trust, and confidence to Law Firm D, Law Firm E, and those firms' clients.

25.     CC-2 lived in and was a licensed attorney in New York.  CC-2 attended law school with NOURAFCHAN.  From in or about 2013 to in or about 2022, CC-2 worked as an attorney for Law Firm F.  From in or about 2022 to in or about 2026, CC-2 worked as an attorney for Investment Bank A.  As an attorney employed by Law Firm F and Investment Bank A, CC-2 owed duties of loyalty, trust, and confidence to Law Firm F, Investment Bank A, and those businesses' clients.

26.     CC-3 lived in New York and Puerto Rico.  CC-3 attended college with NOURAFCHAN and YADGAROV.

27.     CC-4 lived in the United Arab Emirates.

28.     CC-5 lived in Florida.

29.     CC-6 lived in New York.

30.     CC-7 lived in Florida.

31.     CC-8 lived in New York.

32.     CC-9 lived in New Jersey.

33.     CC-10 lived in Florida.

34.     CC-11 lived in New York and Puerto Rico.

35.     CC-12 lived in Florida.

36.     CC-13 lived in Florida.

37.     CC-14 lived in New York.

38.     CC-15 lived in California.

39.     Actelion Ltd. ("Actelion") was a biopharmaceutical company.  At relevant times, Actelion traded on the SIX Swiss Exchange under the ticker symbol ATLN, and its American depositary receipts ("ADRs") traded on the over-the-counter market in the United States under the

4

ticker symbol ALIOY. On or about January 26, 2017, Actelion announced an agreement to be acquired by Johnson & Johnson. Law Firm F represented Actelion in connection with the transaction.

40.     Adevinta ASA ("Adevinta") was an online classifieds company. At relevant times, Adevinta traded on the Oslo Stock Exchange under the ticker symbol ADE, and eBay Inc. ("eBay") was a significant shareholder in Adevinta. On or about November 21, 2023, Adevinta announced an agreement to be acquired by a group of private equity firms. Investment Bank A acted as a financial advisor to eBay in connection with the transaction.

41.     Anadarko Petroleum Corporation ("Anadarko") was an oil company. At relevant times, Anadarko traded on the New York Stock Exchange ("NYSE") under the ticker symbol APC. On or about April 12, 2019, Anadarko announced an agreement to be acquired by Chevron Corporation. On or about May 5, 2019, Occidental Petroleum Corporation ("Occidental") announced a competing offer to acquire Anadarko. Law Firm F represented Anadarko, and Law Firm D represented investment banks providing financing in support of Occidental's offer.

42.     Ardagh Group SA ("Ardagh") was a global supply company of glass, metal, and packaging products. At relevant times, Ardagh traded on the NYSE under the ticker symbol ARD. On or about July 15, 2019, Ardagh announced an agreement to combine Ardagh's Food & Specialty Metal Packaging business with the business of Exal Corporation ("Exal"), a producer of aluminum containers, to form Trivium Packaging. Law Firm D represented a controlling shareholder of Exal in connection with the transaction.

43.     Berkshire Grey, Inc. ("Berkshire") was a technology company. At relevant times, Berkshire traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol BGRY. On or about March 24, 2023, Berkshire and SoftBank Group Corp. ("SoftBank") announced a

definitive agreement under which SoftBank agreed to acquire Berkshire. Law Firm C represented Berkshire in connection with its acquisition by SoftBank.

44. Care.com, Inc. ("Care.com") was a provider of family-care marketplaces. At relevant times, Care.com traded on the NYSE under the ticker symbol CRCM. On or about December 20, 2019, Care.com announced an agreement to be acquired by IAC. Law Firm B represented Care.com in connection with the transaction.

45. Citrix Systems, Inc. ("Citrix") was a technology company. At relevant times, Citrix traded on the NASDAQ under the ticker symbol CTXS. On or about January 31, 2022, Citrix and a group of private equity firms, including affiliates of Vista Equity Partners and Evergreen Coast Capital Corporation (collectively, "Vista"), announced a definitive agreement under which Vista agreed to acquire Citrix. Law Firm C represented Citrix in connection with its acquisition by Vista.

46. C.R. Bard, Inc. ("C.R. Bard") was a medical technology manufacturer. At relevant times, C.R. Bard traded on the NYSE under the ticker symbol BCR. On or about April 23, 2017, C.R. Bard announced an agreement to be acquired by Becton, Dickinson and Company. Law Firm F represented C.R. Bard in connection with the transaction.

47. DSP Group, Inc. ("DSP Group") was a company that manufactured telecommunications chipsets. At relevant times, DSP Group traded on the NASDAQ under the ticker symbol DSPG. On or about August 30, 2021, DSP Group and Synaptics Incorporated ("Synaptics") announced a definitive agreement under which Synaptics agreed to acquire DSP Group. Law Firm C represented Synaptics in connection with the acquisition of DSP Group.

48. Enstar Group Limited ("Enstar") was a global insurance company. At relevant times, Enstar traded on the NASDAQ under the ticker symbol ESGR. On or about July 29, 2024,

Enstar announced a definitive merger agreement under which the global investment firm Sixth Street, with other institutional investors, agreed to acquire Enstar. Law Firm E represented Sixth Street in connection with the transaction.

49.    Express Scripts Holding Company ("Express Scripts") was a pharmacy benefit management company. At relevant times, Express Scripts traded on the NASDAQ under the ticker symbol ESRX. On or about March 8, 2018, Express Scripts announced an agreement to be acquired by Cigna Corporation ("Cigna"). Law Firm F represented Cigna in connection with the transaction.

50.    Glimcher Realty Trust ("Glimcher") was a real estate investment trust. At relevant times, Glimcher traded on the NYSE under the ticker symbol GRT. On or about September 16, 2014, Glimcher announced an agreement to be acquired by Washington Prime Group Inc. ("WPG"). Law Firm F represented WPG in connection with the transaction.

51.    Innophos Holdings, Inc. ("Innophos") was a health and nutrition company. At relevant times, Innophos traded on the NASDAQ under the ticker symbol IPHS. On or about October 21, 2019, Innophos announced an agreement to be acquired by an affiliate of One Rock Capital Partners, LLC ("One Rock"). Law Firm B represented One Rock in connection with the transaction.

52.    IPC Healthcare Inc. ("IPC Healthcare") was a healthcare provider. At relevant times, IPC Healthcare traded on the NASDAQ under the ticker symbol IPCM. On or about August 4, 2015, IPC Healthcare announced an agreement to be acquired by Team Health Holdings, Inc. Law Firm A represented IPC Healthcare in connection with the transaction.

53.    iRobot Corporation ("iRobot") was a technology company. At relevant times, iRobot traded on the NASDAQ under the ticker symbol IRBT. On or about August 5, 2022, iRobot

7

and Amazon.com, Inc. ("Amazon") announced a definitive agreement under which Amazon agreed to acquire iRobot. Law Firm C represented iRobot in connection with its acquisition by Amazon.

54. KnowBe4, Inc. ("KNBE") was an information technology security company. At relevant times, KNBE traded on the NASDAQ under the ticker symbol KNBE. On or about October 12, 2022, KNBE and Vista announced a definitive agreement under which Vista agreed to acquire KNBE. Law Firm C represented an investment bank advising a special committee of KNBE's board of directors in connection with KNBE's acquisition by Vista.

55. Momenta Pharmaceuticals, Inc. ("Momenta") was a biotechnology company. At relevant times, Momenta traded on the NASDAQ under the ticker symbol MNTA. On or about August 19, 2020, Momenta and Johnson & Johnson ("J&J") announced a definitive agreement under which J&J agreed to acquire Momenta. Law Firm B represented Momenta in connection with its acquisition by J&J.

56. Momentive Global Inc. ("Momentive") was a company that made cloud-based survey and experience management products. At relevant times, Momentive traded on the NASDAQ under the ticker symbol MNTV. On or about March 13, 2023, Momentive announced a definitive agreement under which a consortium led by Symphony Technology Group (collectively, "STG") agreed to acquire Momentive. Law Firm C represented an investment bank that acted as financial advisor to Momentive in connection with the acquisition of Momentive by STG.

57. Neustar, Inc. ("Neustar") was an information services provider. At relevant times, Neustar traded on the NYSE under the ticker symbol NSR. On or about December 14, 2016, Neustar announced an agreement to be acquired by an investment group including Golden Gate

Capital and GIC, a Singaporean sovereign wealth fund. Law Firm A represented GIC in connection with the transaction.

58. NextGen Healthcare, Inc. ("NextGen") was a cloud-based healthcare provider. At relevant times, NextGen traded on the NASDAQ under the ticker symbol NXGN. On or about September 6, 2023, NextGen announced an agreement to be acquired by the investment firm Thoma Bravo. Law Firm C represented Thoma Bravo in connection with the transaction.

59. Orchard Therapeutics PLC ("Orchard") was a gene therapy company with United States headquarters located in Boston, Massachusetts. At relevant times, Orchard traded on the NASDAQ under the ticker symbol ORTX. On or about October 5, 2023, Kyowa Kirin Co., Ltd ("Kyowa"), a specialty pharmaceutical company based in Japan, and Orchard announced that the two companies had entered into a definitive agreement for Kyowa to acquire Orchard. Law Firm C represented Orchard in connection with its acquisition by Kyowa.

60. Plantronics Inc. ("Plantronics") was a technology company. At relevant times, Plantronics traded on the NYSE under the ticker symbol PLT. In or about November 2018, Plantronics and Logitech International ("Logitech") conducted discussions regarding a potential transaction through which Logitech would acquire Plantronics. On or about November 26, 2018, Logitech announced that it was terminating those discussions. Law Firm F represented Logitech in connection with the potential transaction.

61. Poshmark, Inc. ("Poshmark") was a commerce marketplace company. At relevant times, Poshmark traded on the NASDAQ under the ticker symbol POSH. On or about October 3, 2022, Poshmark and Naver Corporation ("Naver") announced a definitive agreement under which Naver agreed to acquire Poshmark. Law Firm C represented Poshmark in connection with its acquisition by Naver.

62.    Qualcomm Incorporated ("Qualcomm") was a technology manufacturing company. At relevant times, Qualcomm traded on the NASDAQ under the ticker symbol QCOM. On or about November 6, 2017, it was announced that Broadcom Limited ("Broadcom") offered to acquire Qualcomm. Law Firm F represented Broadcom in connection with the offer.

63.    Qualtrics International Inc. ("Qualtrics") was an experience management company. At relevant times, Qualtrics traded on the NASDAQ under the ticker symbol XM. On or about March 13, 2023, Qualtrics announced a definitive agreement under which Silver Lake and Canada Pension Plan Investment Board (collectively, "Silver Lake") agreed to acquire Qualtrics. Law Firm C represented Qualtrics in connection with its acquisition by Silver Lake.

64.    SailPoint Technologies Holdings, Inc. ("SailPoint") was an enterprise identity security company. At relevant times, SailPoint traded on the NYSE under the ticker symbol SAIL. On or about April 11, 2022, SailPoint and Thoma Bravo announced a definitive agreement under which Thoma Bravo agreed to acquire SailPoint. Law Firm C represented SailPoint in connection with its acquisition by Thoma Bravo.

65.    Taubman Centers, Inc. ("Taubman") was a real estate investment trust. At relevant times, Taubman traded on the NYSE under the ticker symbol TCO. On or about February 10, 2020, Taubman and Simon Property Group, Inc. ("Simon") announced a definitive agreement under which Simon agreed to purchase all of Taubman's common stock. Law Firm B represented Simon in connection with the acquisition of Taubman.

66.    Tim Hortons Inc. ("Tim Hortons") was a retail food and beverage provider. At relevant times, Tim Hortons traded on the NYSE under the ticker symbol THI. On or about August 26, 2014, Tim Hortons announced an agreement to be acquired by Burger King Worldwide, Inc. Law Firm F represented Tim Hortons in connection with the transaction.

10

67.     ZAGG Inc. ("Zagg") was a technology accessory producer. At relevant times, Zagg traded on the NASDAQ under the ticker symbol ZAGG. On or about December 11, 2020, Zagg announced an agreement to be acquired by an investor group led by Evercel, Inc. Law Firm B represented Zagg in connection with the transaction.

### Overview of the Securities Fraud Conspiracies and the Scheme to Defraud

68.     Beginning no later than in or about March 2014 and continuing through at least in or about August 2024, FEJAL, B. FENSTERSZAUB, M. FENSTERSZAUB, S. FENSTERSZAUB, GAVRILOV, HATANIAN, HOROWITZ, IZRAELOV, MORADI, NOURAFCHAN, OSTROV, SALZBERG, SHILIAN, SILVERSTEIN, SUSKIND, YADGAROV, CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, CC-8, CC-9, CC-10, CC-11, CC-12, CC-13, CC-14, and CC-15 conspired with each other, and with others known and unknown to the Grand Jury, to engage in an insider trading scheme to misappropriate, obtain, and trade while in possession of material non-public information ("MNPI") about the merger-and-acquisition activity of various publicly traded companies, generating tens of millions of dollars in illicit insider trading proceeds.

69.     As part of the scheme, NOURAFCHAN and YADGAROV obtained MNPI from lawyers and insiders whom NOURAFCHAN and YADGAROV recruited to join the scheme, including CC-1 and CC-2, as well as MNPI that NOURAFCHAN misappropriated from his employers and their clients. As part of the scheme, NOURAFCHAN and YADGAROV paid the sources, including CC-1 and CC-2, kickbacks generated from illicit trading proceeds in exchange for the MNPI. As further part of the scheme, NOURAFCHAN misappropriated MNPI from his employers and their clients by, among other means, viewing confidential deal-related documents

11

stored on the document management systems of Law Firm A, Law Firm B, and Law Firm C, including documents relating to confidential transactions on which NOURAFCHAN did not work.

70.    As further part of the scheme, NOURAFCHAN and YADGAROV provided the MNPI to a network of traders and middlemen whom they recruited to join the scheme, including CC-3, CC-4, GAVRILOV, IZRAELOV, and SILVERSTEIN, who traded while in possession of MNPI on behalf of NOURAFCHAN and YADAROV, traded on their own behalf in exchange for their agreement to kickback illicit trading proceeds to NOURAFCHAN, YADGAROV, and others, and provided the MNPI to other traders.

71.    As further part of the scheme, middlemen, including CC-3 and SILVERSTEIN, passed the MNPI to other traders—including B. FENSTERSZAUB, M. FENSTERSZAUB, S. FENSTERSZAUB, HOROWITZ, SUSKIND, CC-5, CC-11, CC-13, and others—to trade while in possession of the MNPI in exchange for their agreement to kickback illicit trading proceeds up the chain to the sources of the MNPI, including NOURAFCHAN and YADGAROV.  As further part of the scheme, those traders, including S. FENSTERSZAUB, then passed the MNPI to other traders—including HATANIAN, OSTROV, SALZBERG, CC-6, CC-8, CC-9, CC-10, CC-12, and others—who agreed to trade while in possession of the MNPI in exchange for their agreement to kickback illicit trading proceeds up the tipping chain to the sources of the MNPI, including NOURAFCHAN and YADGAROV.  As further part of the scheme, those traders, including CC-6, agreed with S. FENSTERSZAUB, SILVERSTEIN, and others to pass the MNPI to other traders—including FEJAL, MORADI, SHILIAN, and CC-7—who agreed to trade while in possession of the MNPI in exchange for their agreement to kickback illicit trading proceeds up the tipping chain to the sources of the MNPI, including NOURAFCHAN and YADGAROV.

Object and Purposes of the Securities Fraud Conspiracies and the Scheme to Defraud

72.    The object of the conspiracies and the scheme was to commit securities fraud by trading in the securities of various companies while in possession of MNPI about those companies. The principal purposes of the conspiracies were to make money and to conceal the conspirators' actions from others, including regulators and law enforcement.

Manner and Means of the Securities Fraud Conspiracies and the Scheme to Defraud

73.    Among the manner and means by which FEJAL, B. FENSTERSZAUB, M. FENSTERSZAUB, S. FENSTERSZAUB, GAVRILOV, HATANIAN, HOROWITZ, IZRAELOV, MORADI, NOURAFCHAN, OSTROV, SALZBERG, SHILIAN, SILVERSTEIN, SUSKIND, YADGAROV, CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, CC-8, CC-9, CC-10, CC-11, CC-12, CC-13, CC-14, CC-15, and others known and unknown to the Grand Jury carried out the conspiracy were the following:

a.    Recruiting attorneys and other corporate insiders who had access to MNPI about the merger-and-acquisition activity of publicly traded companies;

b.    Seeking employment at law firms with M&A practices and other types of employers with access to MNPI regarding confidential corporate transactions and M&A deals;

c.    Obtaining MNPI about forthcoming M&A transactions and other confidential corporate matters from law firms, including by viewing confidential documents on law firms' document management systems, including documents that NOURAFCHAN accessed that were stored on a Law Firm C server located in the District of Massachusetts;

13

d.    Misappropriating and sharing that MNPI, in violation of the duties of loyalty, trust, and confidence that the attorneys, including NOURAFCHAN, owed to the sources of the MNPI, including the attorneys' employers and their clients, as well as in violation of insider trading and confidentiality policies that the attorneys, including NOURAFCHAN, were bound by;

e.    Recruiting co-conspirators who agreed to trade in the securities of public companies while in possession of MNPI on behalf of their tippers, and in exchange for an agreement to share in and kickback a portion of the profits generated by their insider trading and other benefits, and who agreed to recruit other traders to do the same;

f.    Trading in the securities of those companies while in possession of MNPI and knowing that the MNPI was obtained in breach of a duty that the sources of the information owed, including trades executed over a securities exchange located in Boston, Massachusetts;

g.    Using ledgers to track illicit trading proceeds and kickback payment amounts;

h.    Transferring proceeds of the illicit trading to corporate insiders and other co-conspirators, directly and indirectly, in cash and other transactions designed to conceal and disguise the nature, location, source, ownership, and control of the insider trading proceeds; and

i.    Taking steps to conceal the conspiracy from regulators and law enforcement, including by: communicating about the MNPI in person and via encrypted messaging applications; instructing co-conspirators during in-

14

person meetings to turn off and put away phones and other wearable electronics; enlisting other individuals to trade on the behalf of co-conspirators to reduce direct connections between tippers and traders; creating and trading in brokerage accounts in the names of shell companies and other corporate entities; trading in foreign brokerage accounts to attempt to evade the supervision of U.S. securities regulators; using coded language and foreign languages, including code words related to travel, flights, religion, and religious instruction to refer to trading, MNPI, and money; using code names for co-conspirators; using burner phones and phones of other individuals; transferring proceeds in cash, through shell companies, and through intermediaries; disguising kickback payments as purported "loans" and business transactions; creating false explanations and sham research to substantiate trading decisions; and lying to and misleading law enforcement, securities regulators, brokerage firms, and law firms.

Overt Acts in Furtherance of the Securities Fraud Conspiracies and the Scheme to Defraud

74.    Beginning no later than in or about March 2014 and continuing through at least in or about August 2024, FEJAL, B. FENSTERSZAUB, M. FENSTERSZAUB, S. FENSTERSZAUB, GAVRILOV, HATANIAN, HOROWITZ, IZRAELOV, MORADI, NOURAFCHAN, OSTROV, SALZBERG, SHILIAN, SILVERSTEIN, SUSKIND, YADGAROV, CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, CC-8, CC-9, CC-10, CC-11, CC-12, CC-13, CC-14, and CC-15, together with others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, including all of the

overt acts alleged in paragraphs 308 through 360 below, in furtherance of the securities fraud conspiracies and the scheme to defraud:

*Tim Hortons and Glimcher*

75.    In or about 2014, NOURAFCHAN and YADGAROV recruited CC-2 to join the scheme and provide NOURAFCHAN and YADGAROV with MNPI about forthcoming M&A deals involving clients of Law Firm F in exchange for money.

76.    On or about August 21, 2014, after CC-2 misappropriated MNPI regarding the potential acquisition of Tim Hortons from Law Firm F and provided the MNPI to NOURAFCHAN and YADGAROV, GAVRILOV purchased Tim Hortons securities while in possession of MNPI in a Russian brokerage account he controlled and held in the name of a shell company formed in the British Virgin Islands.

77.    On or about September 9, 2014, after CC-2 misappropriated MNPI regarding the potential acquisition of Glimcher from Law Firm F and provided the MNPI to NOURAFCHAN and YADGAROV, GAVRILOV purchased Glimcher securities while in possession of MNPI in a Russian brokerage account he controlled and held in the name of a shell company formed in the British Virgin Islands.

*IPC Healthcare and Neustar*

78.    On or about July 6, 2015, after NOURAFCHAN misappropriated MNPI regarding the potential acquisition of IPC Healthcare from Law Firm A and provided it to YADGAROV, GAVRILOV purchased IPC Healthcare securities while in possession of MNPI in a Russian brokerage account he controlled and held in the name of a shell company formed in the British Virgin Islands.

79.     On or about December 2, 2016, after NOURAFCHAN misappropriated MNPI regarding the potential acquisition of Neustar from Law Firm A and provided it to YADGAROV, GAVRILOV purchased Neustar securities while in possession of MNPI.

*Actelion, C.R. Bard, Qualcomm, and Express Scripts*

80.     On or about December 15, 2016, after CC-2 misappropriated MNPI regarding the potential acquisition of Actelion from Law Firm F and provided the MNPI to NOURAFCHAN and YADGAROV, GAVRILOV purchased Actelion securities while in possession of MNPI.

81.     On or about March 31, 2017, after CC-2 misappropriated MNPI regarding the potential acquisition of C.R. Bard from Law Firm F and provided the MNPI to NOURAFCHAN and YADGAROV, GAVRILOV purchased C.R. Bard securities while in possession of MNPI.

82.     On or about October 23, 2017, after CC-2 misappropriated MNPI regarding the potential acquisition of Qualcomm from Law Firm F and provided the MNPI to NOURAFCHAN and YADGAROV, GAVRILOV purchased Qualcomm securities while in possession of MNPI.

83.     On or about March 5, 2018, after CC-2 misappropriated MNPI regarding the potential acquisition of Express Scripts from Law Firm F and provided the MNPI to NOURAFCHAN and YADGAROV, GAVRILOV purchased Express Scripts securities while in possession of MNPI.

*Plantronics, Anadarko, and Ardagh*

84.     On or about October 15, 2018, after CC-2 misappropriated MNPI regarding the potential acquisition of Plantronics from Law Firm F and provided the MNPI to NOURAFCHAN and YADGAROV, GAVRILOV purchased Plantronics securities while in possession of MNPI.

85.     In or about December 2018, after the public announcement that Logitech had terminated acquisition discussions with Plantronics, NOURAFCHAN and YADGAROV told CC-

2 that they had lost a significant amount of money on the Plantronics deal and pressured CC-2 to provide NOURAFCHAN and YADGAROV with MNPI about another deal.

86.    In or about December 2018, NOURAFCHAN and YADGAROV recruited CC-1 to join the insider trading scheme as a source of MNPI.

87.    In or about March and April 2019, after CC-2 misappropriated MNPI regarding the potential acquisition of Anadarko from Law Firm F, CC-2 provided the MNPI to NOURAFCHAN and YADGAROV.

88.    In or about March and April 2019, after CC-1 misappropriated MNPI regarding the potential acquisition of Anadarko from Law Firm D, CC-1 provided the MNPI to NOURAFCHAN and YADGAROV.

89.    On or about March 25, 2019, GAVRILOV purchased Anadarko securities while in possession of MNPI.

90.    In or about June and July 2019, after CC-1 misappropriated MNPI regarding the potential transaction involving Ardagh from Law Firm D, CC-1 provided the MNPI to NOURAFCHAN and YADGAROV.

91.    On or about July 12, 2019, GAVRILOV purchased Ardagh securities while in possession of MNPI.

*Innophos, Care.com, Taubman, and Zagg*

92.    On or about September 10, 2019, NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Innophos from Law Firm B, including by viewing confidential materials on Law Firm B's document management system regarding a potential transaction, which was a deal that NOURAFCHAN did not work on.

93.     On or about September 13, 2019, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Innophos and provided the MNPI to YADGAROV, GAVRILOV purchased Innophos securities while in possession of MNPI.

94.     On or about October 27, 2019, NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Care.com from Law Firm B, including by viewing confidential materials on Law Firm B's document management system regarding a potential transaction, which was a deal that NOURAFCHAN did not work on.

95.     On or about November 8, 2019, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Care.com and provided the MNPI to YADGAROV, GAVRILOV purchased Care.com securities while in possession of MNPI.

96.     On or about January 10, 2020, NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Taubman from Law Firm B, including by viewing confidential materials on Law Firm B's document management system regarding a potential transaction, which was a deal that NOURAFCHAN did not work on.

97.     On or about January 13, 2020, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Taubman and provided the MNPI to YADGAROV, GAVRILOV purchased Taubman securities while in possession of MNPI.

98.     On or about January 22, 2020, after YADGAROV provided MNPI regarding the potential acquisition of Taubman to CC-3, CC-11 purchased Taubman securities while in possession of MNPI on behalf of CC-3.

99.     On or about January 27, 2020, after NOURAFCHAN misappropriated MNPI regarding the potential acquisition of Zagg from Law Firm B, which was a deal that

NOURAFCHAN worked on, and provided the MNPI to YADGAROV, GAVRILOV purchased Zagg securities.

*Momenta*

100.    In or about July and August 2020, NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Momenta from Law Firm B, including by reviewing confidential materials on Law Firm B's document management system regarding a potential transaction, which was a deal that NOURAFCHAN did not work on.

101.    For example, on or about July 31, 2020, after being notified by Law Firm B on or about July 21 that NOURAFCHAN was being terminated by Law Firm B effective August 4, NOURAFCHAN viewed confidential materials on Law Firm B's document management system regarding a potential acquisition of Momenta.

102.    On or about August 3, 2020, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Momenta from Law Firm B and provided the MNPI to SILVERSTEIN, HOROWITZ purchased Momenta securities while in possession of MNPI.

103.    On or about August 5, 2020, after NOURAFCHAN provided MNPI regarding the potential acquisition of Momenta to YADGAROV, IZRAELOV purchased Momenta securities while in possession of MNPI in a brokerage account he controlled.

104.    On or about August 5, 2020, after NOURAFCHAN provided MNPI regarding the potential acquisition of Momenta to SILVERSTEIN, S. FENSTERSZAUB purchased Momenta securities while in possession of MNPI.

105.    On or about August 10, 2020, after SILVERSTEIN provided MNPI regarding the potential acquisition of Momenta to S. FENSTERSZAUB, CC-6 purchased Momenta securities while in possession of MNPI.

106.    On or about August 12, 2020, after NOURAFCHAN provided MNPI regarding the potential acquisition of Momenta to SILVERSTEIN, M. FENSTERSZAUB purchased Momenta securities while in possession of MNPI.

107.    On or about August 13, 2020, after SILVERSTEIN provided MNPI regarding the potential acquisition of Momenta to S. FENSTERSZAUB, CC-8 purchased Momenta securities while in possession of MNPI.

108.    On or about August 14, 2020, after S. FENSTERSZAUB provided MNPI regarding the potential acquisition of Momenta to CC-6, CC-7 purchased Momenta securities while in possession of MNPI.

109.    On or about August 14, 2020, after S. FENSTERSZAUB provided MNPI regarding the potential acquisition of Momenta to CC-6, MORADI purchased Momenta securities while in possession of MNPI.

110.    On or about August 17, 2020, after S. FENSTERSZAUB provided MNPI regarding the potential acquisition of Momenta to HATANIAN, S. FENSTERSZAUB messaged HATANIAN, in relevant part: "According to my brother-in-law it is a done deal, the announcement will be either this week or next." HATANIAN responded: "can't trade on inside info—but fundamentals look good." S. FENSTERSZAUB replied: "And for those reasons, is why I bought shares | Great fundamentals."

111.    On or about August 18, 2020, after NOURAFCHAN provided MNPI regarding the potential acquisition of Momenta to SILVERSTEIN, SILVERSTEIN messaged CC-5: "Get the option. Call me."

112.    On or about August 18, 2020, after S. FENSTERSZAUB provided MNPI regarding the potential acquisition of Momenta to CC-6, SHILIAN purchased Momenta securities while in possession of MNPI.

113.    On or about August 18, 2020, after learning that CC-11 would no longer trade on CC-3's behalf, CC-3 messaged NOURAFCHAN: "Nico, I didn't mean to delay speaking with you. The package was forwarded. I'll have it tomorrow late afternoon and will call to discuss the construction project." NOURAFCHAN responded: "It might be too late, but let's see." CC-3 replied: "I got you. The foundation is not really set up this round. The last time I poured concrete the laborers f*cked it up big time. Really set me back. I'm going to focus on finding a new construction crew and then we'll be building skyscrapers. Until then I may not be so helpful."

114.    On or about August 19, 2020, after the announcement of the Momenta acquisition, SILVERSTEIN messaged CC-5, who did not purchase Momenta securities after receiving MNPI from SILVERSTEIN: "Did u see what happened | We missed out." CC-5 responded: "Shold [*sic*] have listened to you." SILVERSTEIN replied: "Lol. I know."

115.    On or about August 19, 2020, after the announcement of the Momenta acquisition, CC-6 messaged S. FENSTERSZAUB and CC-8: "It looks like the flight took off this morning." CC-8 responded with a picture of stacks of cash wrapped in elastic bands. In response to CC-6's message sending a press release about the acquisition, S. FENSTERSZAUB replied: "Time to take the money and run."

*DSPG*

116.    On or about May 6, 2021, S. FENSTERSZAUB messaged SILVERSTEIN, B. FENSTERSZAUB, M. FENSTERSZAUB, and HOROWITZ: "Gavy, we are all just waiting for

22

you to tell us when the next flight to Israel is." SILVERSTEIN responded: "It's coming soon." S. FENSTERSZAUB replied: "It's to the moon." SILVERSTEIN responded: "hahaha | Otisville."

117.    On or about July 19, 2021, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of DSPG, which was a deal that NOURAFCHAN did not work on.

118.    On or about August 4, 2021, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of DSPG from Law Firm C and provided the MNPI to YADGAROV, IZRAELOV purchased DSPG securities while in possession of MNPI in a brokerage account he controlled.

119.    On or about August 11, 2021, after NOURAFCHAN provided MNPI regarding the potential acquisition of DSPG to SILVERSTEIN, CC-5 purchased DSPG securities while in possession of MNPI.

120.    On or about August 20, 2021, after NOURAFCHAN provided MNPI regarding the potential acquisition of DSPG to YADGAROV, CC-3 purchased DSPG securities while in possession of MNPI.

*Citrix*

121.    On or about October 22, 2021, SILVERSTEIN messaged CC-5: "Gonna have some info beginning of November."

122.    On or about November 1, 2021, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of Citrix, which was approximately one month before NOURAFCHAN began to work on the deal.

123.    On or about November 16, 2021, B. FENSTERSZAUB messaged M. FENSTERSZAUB that he was "[w]aitn for response from gavy," and asked: "Do u daytrade?" M.

23

FENSTERSZAUB replied: "Haven't yet | That's my backup plan of [*sic*] the flight doesn't work out."

124. On or about November 19, 2021, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Citrix from Law Firm C and provided the MNPI to SILVERSTEIN, CC-5 purchased Citrix securities while in possession of MNPI.

125. On or about November 22, 2021, S. FENSTERSZAUB messaged SILVERSTEIN: "Hey man. What's really up with ur friend. When r we getting the info on the flights?" SILVERSTEIN replied: "Hopefully soon. Slight hiccup."

126. On or about November 24, 2021, after NOURAFCHAN provided MNPI regarding the potential acquisition of Citrix to SILVERSTEIN, HOROWITZ purchased Citrix securities while in possession of MNPI.

127. On or about December 23, 2021, after NOURAFCHAN provided MNPI regarding the potential acquisition of Citrix to YADGAROV, IZRAELOV purchased Citrix securities while in possession of MNPI in a brokerage account he controlled.

128. On or about December 26, 2021, S. FENSTERSZAUB messaged SILVERSTEIN: "It's now time for us to take another trip, I need to reach you [*sic*] travel agent." SILVERSTEIN replied: "Agreed. I will try to get in touch with him."

129. On or about December 29, 2021, S. FENSTERSZAUB messaged SILVERSTEIN: "Did your other phone start ringing yet?" SILVERSTEIN replied: "Supposedly end of next week | he took the holidays off."

130. On or about January 12, 2022, while on a "leave of absence" from Law Firm C, and having not worked on the potential acquisition of Citrix in more than one month, NOURAFCHAN

24

viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of Citrix.

131.    On or about January 18, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of Citrix to YADGAROV, CC-3 purchased Citrix securities while in possession of MNPI.

132.    On or about January 24, 2022, S. FENSTERSZAUB messaged SILVERSTEIN asking to meet "so we could put a reservation in to the Travel agent." SILVERSTEIN replied: "I need to acquire the flight info from my agent."

133.    On or about the same day, January 24, 2022, SILVERSTEIN messaged NOURAFCHAN: "Hey bro | Trying to reserve the trip just want to finalize the travel details."

134.    On or about January 25, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of Citrix to SILVERSTEIN, S. FENSTERSZAUB purchased Citrix securities while in possession of MNPI.

135.    On or about January 25, 2022, SILVERSTEIN sent S. FENSTERSZAUB the following image:



S. FENSTERSZAUB responded by sending SILVERSTEIN an emoji of a bag of money with a dollar sign on it.

136.    On or about January 28, 2022, S. FENSTERSZAUB messaged CC-12: "I need to tell you about a flight that's taking off early next week. You have to book tickets by tomorrow."

*SailPoint*

137.   On or about December 14, 2021, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of SailPoint, which was a deal that NOURAFCHAN did not work on.

138.   On or about February 10, 2022, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of SailPoint from Law Firm C and provided the MNPI to YADGAROV, IZRAELOV purchased SailPoint securities while in possession of MNPI in a brokerage account he controlled.

139.   On or about March 28, 2022, NOURAFCHAN, while on a "leave of absence" from Law Firm C, viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of SailPoint.

140.   On or about March 31, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of SailPoint to SILVERSTEIN, HOROWITZ purchased SailPoint securities while in possession of MNPI.

141.   On or about April 1, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of SailPoint to YADGAROV, CC-3 purchased SailPoint securities while in possession of MNPI.

142.   On or about April 5, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of SailPoint to SILVERSTEIN, B. FENSTERSZAUB purchased SailPoint securities while in possession of MNPI.

143.   On or about April 5, 2022, SILVERSTEIN messaged S. FENSTERSZAUB: "I wanna get you some money to put in. I should have 12k by tomorrow." S. FENSTERSZAUB replied: "We will be in touch tomorrow morning. We are going to kill this."

144.    On or about April 6, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of SailPoint to SILVERSTEIN, CC-5 purchased SailPoint securities while in possession of MNPI.

145.    On or about April 8, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of SailPoint to SILVERSTEIN, M. FENSTERSZAUB purchased SailPoint securities while in possession of MNPI.

146.    On or about April 8, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of SailPoint to B. FENSTERSZAUB, SUSKIND purchased SailPoint securities while in possession of MNPI.

147.    On or about April 8, 2022, SILVERSTEIN sent S. FENSTERSZAUB a payment to use to purchase SailPoint securities on behalf of SILVERSTEIN.

148.    On or about April 11, 2022, following the announcement of the SailPoint acquisition, S. FENSTERSZAUB, who did not purchase SailPoint securities before the announcement, messaged B. FENSTERSZAUB: "Ship just sailed!!! | Info was a little off again."

149.    On or about April 11, 2022, SILVERSTEIN messaged S. FENSTERSZAUB: "Wtffffffffff". S. FENSTERSZAUB responded: "In his defense it is before Pesach | We just arrived at the airport to watch the plane takeoff | Too little too late". SILVERSTEIN replied: "What a waste."

150.    On or about April 14, 2022, SILVERSTEIN messaged S. FENSTERSZAUB: "Hopefully we will get serious revenge on the next one.  And it should come very soon."

151.    On or about April 18 and 19, 2022, S. FENSTERSZAUB returned the money SILVERSTEIN had sent him, split into three payments.

152.    On or about April 19, 2022, while NOURAFCHAN was traveling internationally, including in Morocco, S. FENSTERSZAUB messaged SILVERSTEIN: "So.......When the next flight??" SILVERSTEIN responded: "The guy is in Morocco | After Pesach we will see."

153.    On or about May 9, 2022, M. FENSTERSZAUB messaged SILVERSTEIN: "I'm pretty broke." SILVERSTEIN responded: "I hear you.  We are all broke.  Need a darn flight." M. FENSTERSZAUB replied: "YES."

*iRobot*

154.    On or about June 7, 2022, NOURAFCHAN, while on a "leave of absence" from Law Firm C, viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of iRobot, which was a deal that NOURAFCHAN did not work on.

155.    On or about June 9, 2022, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of iRobot from Law Firm C and provided the MNPI to SILVERSTEIN, CC-5 purchased iRobot securities while in possession of MNPI.

156.    On or about June 9, 2022, SILVERSTEIN messaged M. FENSTERSZAUB, telling him to "pack his bags."  After M. FENSTERSZAUB replied that he did not know what SILVERSTEIN's message meant, SILVERSTEIN sent M. FENSTERSZAUB a GIF of an airplane taking off.

157.    On or about June 9, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of iRobot to SILVERSTEIN, HOROWITZ purchased iRobot securities while in possession of MNPI.

158.    On or about June 9, 2022, B. FENSTERSZAUB messaged SUSKIND: "Joey!!! | Got another flight coming in!" SUSKIND responded: "Yo guy | Gimme the scoop | Gimme that

crack." After SUSKIND messaged B. FENSTERSZAUB that he was returning from a European vacation soon, B. FENSTERSZAUB replied: "You about to pay for that vacation and then some brother."

159. On or about June 10, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of iRobot to SILVERSTEIN, B. FENSTERSZAUB purchased iRobot securities while in possession of MNPI.

160. On or about June 10, 2022, SILVERSTEIN messaged M. FENSTERSZAUB Hebrew letters representing iRobot's stock ticker.

161. On or about June 10, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of iRobot to SILVERSTEIN, M. FENSTERSZAUB purchased iRobot securities while in possession of MNPI.

162. On or about June 10, 2022, S. FENSTERSZAUB messaged SILVERSTEIN: "I want to talk about our flight," and "there is no way in hell we are missing this one."

163. On or about June 12, 2022, S. FENSTERSZAUB messaged CC-6: "I have some more flight information."

164. On or about June 13, 2022, S. FENSTERSZAUB messaged SILVERSTEIN: "Are you sending me money for the Rabbi. The one that we are praying for that is having surgery in a couple weeks." SILVERSTEIN replied: "Working on it." S. FENSTERSZAUB responded: "I have a friend that would like to donate towards the surgery but he wants to know when the surgery is scheduled for." SILVERSTEIN replied: "What a Tzadik your friend is. Hopefully will get the date of the surgery soon." S. FENSTERSZAUB responded: "Also, I really need to know when the rabbi is scheduled for surgery. Anyway we could find out soon."

165. On or about June 13, 2022, S. FENSTERSZAUB messaged CC-12: "Are you around? I have some flight information."

166. On or about June 13, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of iRobot to S. FENSTERSZAUB, CC-12 purchased iRobot securities while in possession of MNPI.

167. On or about June 13, 2022, S. FENSTERSZAUB messaged HATANIAN: "Call me when you have a moment to talk about the flight."

168. On or about June 14, 2022, SILVERSTEIN messaged NOURAFCHAN: "Hey bro do we know when Dr. Jackson's surgery is scheduled for?"

169. On or about June 14, 2022, SILVERSTEIN messaged S. FENSTERSZAUB: "They need to wait for the doctor's blood pressure to stabilize before they cab [sic] perform any surgery. So we still need to wait."

170. On or about June 16, 2022, S. FENSTERSZAUB purchased iRobot securities while in possession of MNPI.

171. Beginning on or about June 16, 2022, and continuing through on or about July 8, 2022, SILVERSTEIN and S. FENSTERSZAUB exchanged the following messages:

S. FENSTERSZAUB: We cannot miss this boat!!

S. FENSTERSZAUB: How's the rabbi??

SILVERSTEIN: He's stable

S. FENSTERSZAUB: Is he still scheduled for surgery?

SILVERSTEIN: We are still waiting for the Dr to check if it's still needed

S. FENSTERSZAUB: Now I'm confused and worried at the same time

SILVERSTEIN: U shouldn't be worried

S. FENSTERSZAUB: Well have you gotten through to anyone at the hospital | Any

chance you can find out today how the Rabbi is feeling | ?

SILVESTEIN: Unfortunately nothing

S. FENSTERSZAUB: Dude that's scary

SILVERSTEIN: Yeah

S. FENSTERSZAUB: Should I tell ppl to pull out?

SILVERSTEIN: Stagnant. No movement on the situation

S. FENSTERSZAUB: Find out if we should bail

. . .

S. FENSTERSZAUB: So what should I advise ppl

SILVERSTEIN: Are they even

S. FENSTERSZAUB: I could find out but based on the current price I would assume so

SILVERSTEIN: So pull. But we might go back at it shortly.

S. FENSTERSZAUB: I have to remember to tell people tomorrow | Had the deal died? Or can we still be hopeful? Any way to find out

SILVERSTEIN: Still be hopeful. I will speak with him today

S. FENSTERSZAUB: I can't tell you how badly I need this

172.   On or about June 21, 2022, CC-12 messaged S. FENSTERSZAUB: "Also, still no price? | No price yet? | And timeline."  S. FENSTERSZAUB replied: "Nope, not yet.  All I got was that he said soon."

173.   On or about June 30, 2022, after M. FENSTERSZAUB and SILVERSTEIN exchanged messages about money issues, M. FENSTERSZAUB messaged SILVERSTEIN: "We need that damn rebbe already."  SILVERSTEIN responded: "We might be starting to learn next week god willing."  M. FENSTERSZAUB replied: "At this point I might just start learning the Koran."

174. On or about July 7, 2022, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of iRobot.

175. On or about July 7, 2022, after NOURAFCHAN messaged SILVERSTEIN asking him to come meet NOURAFCHAN in person, and after SILVERSTEIN responded that he could not due to other travel, SILVERSTEIN messaged NOURAFCHAN: "Hows the doctor feeling?" NOURAFCHAN responded: "I'll call you."

176. On or about July 12, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of iRobot to SILVERSTEIN, B. FENSTERSZAUB messaged M. FENSTERSZAUB about SILVERSTEIN, who married the sister of B. FENSTERSZAUB and M. FENSTERSZAUB several years earlier: "Gavy said he has a wedding date!" followed by a photograph of iRobot call options.

177. On or about July 13, 2022, SILVERSTEIN messaged M. FENSTERSZAUB about B. FENSTERSZAUB: "Did you speak to Moshe about the learning?" and then added, responding to M. FENSTERSZAUB's June 30 message, "You don't need to learn Koran anymore."

178. On or about July 14, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of iRobot to S. FENSTERSZAUB, CC-6 purchased iRobot securities while in possession of MNPI.

179. On or about July 15, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of iRobot to S. FENSTERSZAUB, CC-10 purchased iRobot securities while in possession of MNPI.

180. On or about July 19, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of iRobot to S. FENSTERSZAUB, CC-7 purchased iRobot securities while in possession of MNPI.

181.    On or about July 19, 2022, CC-6 messaged SHILIAN: "Flight details tom night. We'll meet at my house." SHILIAN responded: "Perfect I'll bring the drinks."

182.    On or about July 20, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of iRobot to SILVERSTEIN, SUSKIND purchased iRobot securities while in possession of MNPI.

183.    On or about July 21, 2022, after S. FENSTERSZAUB provided MNPI regarding the potential acquisition of iRobot to CC-6, FEJAL purchased iRobot securities while in possession of MNPI.

184.    On or about July 22, 2022, after S. FENSTERSZAUB provided MNPI regarding the potential acquisition of iRobot to CC-6, SHILIAN purchased iRobot securities while in possession of MNPI.

185.    On or about July 26, 2022, CC-6 messaged both SHILIAN and MORADI, separately: "Flights schedule for August 12. Just got a call." SHILIAN responded: "Ok do we need to book earlier or not?" CC-6 responded: "We will talk in person." MORADI responded: "Nice!"

186.    On or about July 27, 2022, after S. FENSTERSZAUB provided MNPI regarding the potential acquisition of iRobot to CC-6, MORADI purchased iRobot securities while in possession of MNPI.

187.    On or about July 28, 2022, HOROWITZ messaged S. FENSTERSZAUB a news article about the announcement of several insider trading indictments in July 2022.

188.    On or about July 28, 2022, B. FENSTERSZAUB messaged M. FENSTERSZAUB the same news article about insider trading indictments and asked M. FENSTERSZAUB if

HOROWITZ had sent the article to him.    M. FENSTERSZAUB replied by sending B. FENSTERSZAUB a screenshot of the following internet search: "insider trading definition".

189.    On or about July 29, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of iRobot to SILVERSTEIN, CC-13 purchased iRobot securities while in possession of MNPI.

190.    On or about July 29, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of iRobot to S. FENSTERSZAUB, CC-8 purchased iRobot securities while in possession of MNPI.

191.    On or about July 29, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of iRobot to S. FENSTERSZAUB, CC-9 purchased iRobot securities while in possession of MNPI.

192.    On or about July 29, 2022, SUSKIND sent B. FENSTERSZAUB messages about how much iRobot securities he had purchased and asked: "Leave it as is?"  B. FENSTERSZAUB replied: "I would, that's plenty | cheers mate."  SUSKIND responded with the following GIF:



193.    On or about July 29, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of iRobot to S. FENSTERSZAUB, HATANIAN purchased iRobot securities while in possession of MNPI.

194.    On or about August 1, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of iRobot to S. FENSTERSZAUB, OSTROV purchased iRobot securities while in possession of MNPI.

195. On or about August 1, 2022, after SILVERSTEIN provided MNPI regarding the potential acquisition of iRobot to S. FENSTERSZAUB, SALZBERG purchased iRobot securities while in possession of MNPI.

196. On or about August 5, 2022, after the announcement of the iRobot acquisition, CC-6 messaged S. FENSTERSZAUB a news article about the deal and asked: "What happened to aug 12 lol | and $65". S. FENSTERSZAUB replied: "Last minute closing negotiations | I guess."

197. On or about August 5, 2022, CC-12 sent S. FENSTERSZAUB a news article about the deal. S. FENSTERSZAUB responded: "Boom!" CC-12 replied: "Off by $2". S. FENSTERSZAUB responded: "Last minute closing negotiations probably."

198. On or about August 5, 2022, S. FENSTERSZAUB messaged B. FENSTERSZAUB: "$$$". B. FENSTERSZAUB responded with emojis of a rocket and clapping hands.

199. On or about August 5, 2022, SHILIAN messaged CC-6 via audio, in relevant part: "Yo, if we were to have bought the plane tickets for $50, instead of $55, we would have made double." CC-6 responded via audio, in relevant part: "I was just going based off the information I got, because the 55 was cheaper, but it looks like last minute negotiations were changed . . . on the next one, we have to buy as close to the money as possible, right away."

200. On or about August 5, 2022, SUSKIND messaged B. FENSTERSZAUB an article about the deal and stated: "Thought it would be 65. This sucks. [Silly face emoji]." B. FENSTERSZAUB responded: "Check out your pre market | Will b more, hakuna matada."

201. On or about August 5, 2022, M. FENSTERSZAUB, who had loaned SILVERSTEIN money, messaged SILVERSTEIN: "0 balance" and a champagne bottle emoji. SILVERSTEIN responded with champagne bottle, cheers, and fist-bump emojis. Discussing a

kickback, M. FENSTERSZAUB messaged SILVERSTEIN: "Tried calling Simon, went straight to voicemail | Spoke to him | He's not budging | He did agree about splitting the 50 though."

*Poshmark and KNBE*

202. On or about September 13, 2022, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of Poshmark, which was a deal that NOURAFCHAN did not work on.

203. On or about September 15, 2022, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Poshmark from Law Firm C and provided the MNPI to SILVERSTEIN, SUSKIND purchased Poshmark securities while in possession of MNPI.

204. On or about September 19, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of Poshmark to SILVERSTEIN, S. FENSTERSZAUB purchased Poshmark securities while in possession of MNPI.

205. On or about September 21, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of Poshmark to SILVERSTEIN, CC-5 purchased Poshmark securities while in possession of MNPI.

206. On or about September 26, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of Poshmark to SILVERSTEIN, HOROWITZ purchased Poshmark securities while in possession of MNPI.

207. On or about October 4, 2022, after the announcement of the Poshmark acquisition, SILVERSTEIN messaged S. FENSTERSZAUB a news article about the acquisition and stated: "17.90" and "sh*t." S. FENSTERSZAUB responded: "Couple weeks late. Better late than never." SILVERSTEIN replied: "It happened."

208.    On or about September 29, 2022, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of KNBE, which was a deal that NOURAFCHAN worked on.

209.    On or about September 30, 2022, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of KNBE from Law Firm C and provided the MNPI to YADGAROV, IZRAELOV purchased KNBE securities while in possession of MNPI in a brokerage account he controlled.

210.    On or about October 2, 2022, after speaking with S. FENSTERSZAUB, CC-6 messaged CC-7: "I will have more details tomorrow, but I just got a phone call to make sure that your account is funded because we have a flight taking off in one week.  If you need to fund, do it tom so it's cleared."

211.    On or about October 3, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of KNBE to SILVERSTEIN, B. FENSTERSZAUB purchased KNBE securities while in possession of MNPI.

212.    On or about October 3, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of KNBE to SILVERSTEIN, S. FENSTERSZAUB purchased KNBE securities while in possession of MNPI.

213.    On or about October 3, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of KNBE to SILVERSTEIN, CC-5 purchased KNBE securities while in possession of MNPI.

214.    On or about October 3, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of KNBE to SILVERSTEIN, SUSKIND purchased KNBE securities while in possession of MNPI.

215.    On or about October 7, 2022, after NOURAFCHAN provided MNPI regarding the potential acquisition of KNBE to SILVERSTEIN, HOROWITZ purchased KNBE securities while in possession of MNPI.

216.    On or about October 9, 2022, after OSTROV messaged S. FENSTERSZAUB asking if he "heard any updates," S. FENSTERSZAUB responded: "It's, well, the deal's not off, but we missed it.  Apparently, that's what stopped them from getting to the closing table.  Um, information leaked to the public, so now everybody knows about it, so the price already went up, so there's nothing to talk about, unfortunately, we got screwed by someone leaking information. But all good, we'll wait for the next one."

217.    On or about October 12, 2022, after the announcement of the acquisition of KNBE, B. FENSTERSZAUB, separately, sent an article about the deal to S. FENSTERSZAUB and SUSKIND.  S. FENSTERSZAUB responded: "Finally happened."

218.    On or about October 22, 2022, B. FENSTERSZAUB messaged SUSKIND: "U calculate dollar amounts on last run papi?!"  After responding "pennies," SUSKIND sent B. FENSTERSZAUB screenshots of calculator images showing SUSKIND's profits on KNBE "stock" and "options."  B. FENSTERSZAUB replied: "So around 30k."  SUSKIND responded: "poop."  B. FENSTERSZAUB replied: "Yeah | Will be better."  SUSKIND responded: "Where the next at."

219.    On or about October 28, 2022, B. FENSTERSZAUB messaged SUSKIND: "No news ovr weekend," and "actually joey, wan drop off scrilla?"  SUSKIND responded: "Is it in exchange for any particular information? [thinking emoji]", and then made a cash payment to B. FENSTERSZAUB.

220.    On or about October 31, 2022, SUSKIND messaged B. FENSTERSZAUB: "Where ma deals at." B. FENSTERSZAUB replied: "Comin."

221.    On or about November 13, 2022, S. FENSTERSZAUB messaged B. FENSTERSZAUB, M. FENSTERSZAUB, and HOROWITZ: "We need to meet today to come up with a plan. For our next flight. | Or we could wait for five more deals to pass us by."

222.    On or about November 13, 2022, SUSKIND messaged B. FENSTERSZAUB: "where the deals at yo." B. FENSTERSZAUB replied: "new dealz comin shortly | b redy."

223.    On or about December 7, 2022, S. FENSTERSZAUB messaged SILVERSTEIN: "We need to book a flight. All the other passengers are asking." SILVERSTEIN responded: "I don't have anything yet."

224.    On or about December 29, 2022, S. FENSTERSZAUB messaged SILVERSTEIN a clip from the movie Jerry Maguire, with the caption "Show me the money!!!", and wrote: "I don't wanna lose the new people." SILVERSTEIN replied: "Out of country for nye." S. FENSTERSZAUB responded, in relevant part: "He could still give the info from wherever he is on the planet | Let's goooooo | I just don't understand why it matters that he's out of the country. He forgot the information when he landed?...F*ck!!! We need something quick or I'm going to lose all the people."

*Qualtrics, Momentive, and Berkshire*

225.    On or about January 30, 2023, OSTROV messaged S. FENSTERSZAUB: "Could use some hot weather and some good upcoming news," and sent a GIF of the Sesame Street character Elmo wearing sunglasses with a stack of money. S. FENSTERSZAUB responded: "Amen. He's flying out to meet next week. Has some news hopefully something great."

39

226.  On or about February 7, 2023, after S. FENSTERSZAUB advised CC-6 that MNPI regarding transactions would be forthcoming, CC-6 messaged CC-7: "The flight attendant called me. He said he's waiting for the pilot to finalize details on the flight and then we can schedule takeoff. So if your [sic] want to fly, make sure you have your passport ready."

227.  On or about February 8, 2023, SILVERSTEIN traveled to California to discuss the insider trading scheme with NOURAFCHAN.

228.  On or about the same day, February 8, 2023, S. FENSTERSZAUB messaged SILVERSTEIN: "I think I'm more excited than you." SILVERSTEIN responded: "I think you are. I'm not excited until I hear something." S. FENSTERSZAUB replied: "Let's kill this!!" SILVERSTEIN responded with a fist emoji and wrote: "That's the plan. I'm just hoping there is something." S. FENSTERSZAUB responded: "If he makes you fly out for nothing, I give you full permission to kick his a**."

229.  On or about the same day, February 8, 2023, S. FENSTERSZAUB messaged OSTROV: "Meeting today. I'm waiting too. Let's go!!!!!" OSTROV responded: "Need action!!"

230.  On or about the same day, February 8, 2023, S. FENSTERSZAUB messaged CC-12 instructing him to open a brokerage account in which he could trade options and said: "He is on the plane right now to California to obtain the information as we speak," and "my guy is on his way to get the info now."

231.  On or about February 9, 2023, following SILVERSTEIN's meeting with NOURAFCHAN, S. FENSTERSZAUB messaged SILVERSTEIN: "And... | Ur killing me here." SILVERSTEIN replied: "Nothing imminent. We have time. Work on raising." S. FENSTERSZAUB responded: "Then Wtf did u have to fly out there?" SILVERSTEIN responded:

"To understand the process." S. FENSTERSZAUB replied: "That sucks so much because I already rallied the troops."

232. On or about February 12, 2023, after failing to meet in person, B. FENSTERSZAUB messaged SUSKIND: "No worries, nothing I can't discuss over the phone with you yet."

233. On or about February 14, 2023, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of Momentive, which was a deal that NOURAFCHAN did not work on.

234. On or about February 15, 2023, S. FENSTERSZAUB messaged SILVERSTEIN: "Come on man. We need some news!!! | He has to be able to at least give us the spread | The date. Something."

235. On or about February 16, 2023, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of Qualtrics.

236. On or about February 17, 2023, S. FENSTERSZAUB messaged SILVERSTEIN: "Yo I need to give these people an update!! I'm getting 20 calls a day | I'm working on some serious money bro... | How do we not have any information yet? Dude, you have to push him. We need some sort of info to keep these people interested."

237. On or about February 21, 2023, S. FENSTERSZAUB messaged OSTROV: "Several deals are on the table right now waiting on one of them to get closer to closing."

238. On or about February 21, 2023, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Qualtrics from Law Firm C and provided the MNPI to SILVERSTEIN, CC-5 purchased Qualtrics securities while in possession of MNPI.

41

239.    On or about February 21, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Qualtrics to SILVERSTEIN, S. FENSTERSZAUB purchased Qualtrics securities while in possession of MNPI.

240.    On or about February 22, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Qualtrics to SILVERSTEIN, HOROWTIZ purchased Qualtrics securities while in possession of MNPI.

241.    On or about February 22, 2023, after SILVERSTEIN provided MNPI regarding a potential acquisition of Qualtrics to S. FENSTERSZAUB, CC-6 purchased Qualtrics securities while in possession of MNPI.

242.    On or about February 23, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Qualtrics to SILVERSTEIN, B. FENSTERSZAUB purchased Qualtrics securities while in possession of MNPI.

243.    On or about February 23, 2023, after S. FENSTERSZAUB provided MNPI regarding a potential acquisition of Qualtrics to CC-6, CC-7 purchased Qualtrics securities while in possession of MNPI.

244.    On or about February 24, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Qualtrics to SILVERSTEIN, SUSKIND purchased Qualtrics securities while in possession of MNPI.

245.    On or about February 27, 2023, after S. FENSTERSZAUB provided MNPI regarding a potential acquisition of Qualtrics to CC-6, SHILIAN purchased Qualtrics securities while in possession of MNPI.

246.    On or about March 8, 2023, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of Momentive.

42

247.    On or about March 10, 2023, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Momentive from Law Firm C and provided the MNPI to SILVERSTEIN, S. FENSTERSZAUB purchased Momentive securities while in possession of MNPI.

248.    On or about March 10, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Momentive to SILVERSTEIN, B. FENSTERSZAUB purchased Momentive securities while in possession of MNPI.

249.    On or about March 10, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Momentive to SILVERSTEIN, M. FENSTERSZAUB purchased Momentive securities while in possession of MNPI.

250.    On or about March 10, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Momentive to SILVERSTEIN, SUSKIND purchased Momentive securities while in possession of MNPI.

251.    On or about March 10, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Momentive to SILVERSTEIN, HOROWITZ purchased Momentive securities while in possession of MNPI.

252.    On or about March 10, 2023, after SILVERSTEIN provided MNPI regarding a potential acquisition of Momentive to S. FENSTERSZAUB, OSTROV purchased Momentive securities while in possession of MNPI.

253.    On or about March 10, 2023, after SILVERSTEIN provided MNPI regarding a potential acquisition of Momentive to S. FENSTERSZAUB, HATANIAN purchased Momentive securities while in possession of MNPI.

254.    On or about March 10, 2023, after SILVERSTEIN provided MNPI regarding a potential acquisition of Momentive to S. FENSTERSZAUB, SALZBERG purchased Momentive securities while in possession of MNPI.

255.    On or about March 10, 2023, after SILVERSTEIN provided MNPI regarding a potential acquisition of Momentive to S. FENSTERSZAUB, CC-6 purchased Momentive securities while in possession of MNPI.

256.    On or about March 10, 2023, SHILIAN messaged CC-6: "Let me try to buy the other flight as well what was the name?" CC-6 responded: "Mntv".

257.    On or about March 10, 2023, CC-6 messaged CC-7:

*M*enachem

*N*achman

*T*uvya

*V*ladmir

258.    On or about March 10, 2023, after S. FENSTERSZAUB provided MNPI regarding a potential acquisition of Momentive to CC-6, CC-7 purchased Momentive securities while in possession of MNPI.

259.    On or about March 10, 2023, after S. FENSTERSZAUB provided MNPI regarding a potential acquisition of Momentive to CC-6, FEJAL purchased Momentive securities while in possession of MNPI.

260.    On or about March 10, 2023, after S. FENSTERSZAUB provided MNPI regarding a potential acquisition of Momentive to CC-6, MORADI purchased Momentive securities while in possession of MNPI.

261.    On or about March 10, 2023, after S. FENSTERSZAUB provided MNPI regarding a potential acquisition of Momentive to CC-6, CC-8 purchased Momentive securities while in possession of MNPI.

262.    On or about March 10, 2023, after S. FENSTERSZAUB provided MNPI regarding a potential acquisition of Momentive to CC-6, CC-9 purchased Momentive securities while in possession of MNPI.

263.    On or about March 13, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Momentive to SILVERSTEIN, CC-5 purchased Momentive securities while in possession of MNPI.

264.    On or about March 13, 2023, hours before the Momentive acquisition announcement, SALZBERG messaged S. FENSTERSZAUB, asking whether the "administration decided when the tuition increase will be taking effect? Like a date?" S. FENSTERSZAUB: "they said by Friday.  Just not sure if before or after the closet [*sic*]."

265.    On or about March 14, 2023, CC-6 messaged SHILIAN: "Pack your suitcase. Pilot is ready for next flight."

266.    On or about March 16, 2023, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of Berkshire, which was a deal that NOURAFCHAN did not work on.

267.    On or about March 17, 2023, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Berkshire from Law Firm C and provided the MNPI to SILVERSTEIN, B. FENSTERSZAUB purchased Berkshire securities while in possession of MNPI.

268.    On or about March 17, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Berkshire to SILVERSTEIN, SUSKIND purchased Berkshire securities while in possession of MNPI.

269.    On or about March 17, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Berkshire to SILVERSTEIN, S. FENSTERSZAUB purchased Berkshire securities while in possession of MNPI.

270.    On or about March 17, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Berkshire to SILVERSTEIN, HOROWITZ purchased Berkshire securities while in possession of MNPI.

271.    On or about March 17, 2023, after SILVERSTEIN provided MNPI regarding a potential acquisition of Berkshire to S. FENSTERSZAUB, CC-6 purchased Berkshire securities, while in possession of MNPI.

272.    On or about March 20, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of Berkshire to YADGAROV, IZRAELOV purchased Berkshire securities in a brokerage account he controlled while in possession of MNPI.

273.    On or about March 20, 2023, CC-6 messaged S. FENSTERSZAUB: "No announcement yet." S. FENSTERSZAUB replied: "I'm waiting too."

274.    On or about March 21, 2023, CC-6 messaged S. FENSTERSZAUB: "BGRY at 1.2." S. FENSTERSZAUB responded: "And still no news, so weird | I guess that means the news is coming any second now."

*NextGen, Orchard, Adevinta, and Enstar*

275.    On or about August 7, 2023, CC-2 misappropriated MNPI regarding a potential acquisition of Adevinta from Investment Bank A and provided the MNPI to YADGAROV.

276. On or about August 9 and 16, 2023, having been notified in June 2023 that Law Firm C was terminating him in September 2023, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of NextGen, which was a deal that NOURAFCHAN did not work on.

277. On or about August 18, 2023, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of NextGen from Law Firm C and provided the MNPI to YADGAROV, IZRAELOV purchased NextGen securities while in possession of MNPI in a brokerage account he controlled.

278. On or about August 22, 2023, SUSKIND, while waiting to meet B. FENSTERSZAUB, messaged B. FENSTERSZAUB: "Is it worthwhile for me to stay here? | Do you have a manilla envelope for me." B. FENSTERSZAUB responded: "Don't have news yet no | Let's see by morning."

279. On or about August 23, 2023, B. FENSTERSZAUB messaged SUSKIND: "Nothin yet. Bro | Still waitin | No news yet last night | But comin." After they arranged to meet for lunch that day, B. FENSTERSZAUB messaged SUSKIND: "hopefully w good news." SUSKIND responded: "Then I can pay for it."

280. On or about August 24, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of NextGen to SILVERSTEIN, SUSKIND purchased NextGen securities while in possession of MNPI.

281. On or about August 29, 2023, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of NextGen.

282.    On or about August 30, 2023, NOURAFCHAN messaged YADGAROV: "Did we do it?  Buy more?"  YADGAROV replied: "Yes."  NOURAFCHAN responded: "Nice bro I think it'll be good | Don't worry about Eddie right now.  Leave him alone.  Just focus on Alan."

283.    On or about August 31, 2023, NOURAFCHAN messaged YADGAROV: "Call me | Take Alan to Wolf and Lamb! | Order the Cowboy steak | And don't forget to invite Yossi" and "number 1 too."

284.    On or about September 4, 2023, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of NextGen.

285.    On or about September 4, 2023, after NOURAFCHAN provided MNPI regarding a potential acquisition of NextGen to CC-4, CC-4 attempted to purchase NextGen securities while in possession of MNPI.

286.    On or about September 5, 2023, NOURAFCHAN messaged SILVERSTEIN: "Remember beginning of day 6 so use your sechel | there is still some room | Alan going to Israel tomorrow probably."  SILVERSTEIN responded: "Guys a real jetsetter."

287.    On or about September 5, 2023, B. FENSTERSAUB messaged SUSKIND: "To da moon [airplane emoji]."

288.    On or about September 5, 2023, NOURAFCHAN—having not worked on a billable matter for a Law Firm C client since April 2023—viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of Orchard, which was a deal that NOURAFCHAN did not work on.

289.    On or about September 6, 2023, the day of the announcement of the NextGen acquisition, B. FENSTERSZAUB sent SUSKIND a GIF of a fictional mafia boss smoking a cigar.

290. On or about September 15, 2023, after NOURAFCHAN misappropriated MNPI regarding a potential acquisition of Orchard from Law Firm C, and after NOURAFCHAN and YADGAROV provided the MNPI regarding a potential acquisition of Orchard to IZRAELOV, IZRAELOV purchased Orchard securities while in possession of MNPI in a brokerage account he controlled.

291. On or about September 18, 2023, after NOURAFCHAN and YADGAROV provided MNPI regarding a potential acquisitions of Orchard and Adevinta to CC-4, CC-4 purchased Orchard securities while in possession of MNPI.

292. On or about September 22, 2023, the day that NOURAFCHAN turned in his firm-issued laptop to Law Firm C, NOURAFCHAN viewed confidential materials on Law Firm C's document management system regarding a potential acquisition of Orchard.

293. On or about October 27, 2023, SILVERSTEIN told B. FENSTERSZAUB on a phone call, in relevant part: "Another thing, listen: an important date is November 9th | The Pied Piper comes down | But listen to this—listen to this, he's like, 'we're gonna have another good one coming soon.' | He told me, he's—he obviously doesn't work anymore | but um, he has uh, this other shul that now is uh going on full—full on..." B. FENSTERSZAUB replied, in relevant part: "First of all, either way, we owe what we owe | Either way, that's if he was coming and he said he has nothing—let's say he's not davening or doing any torahs, mitzvahs | let's say he said 'I don't have anything, f*ck you, give me my money.' We'd still be like alright, torah and mitzvahs. We gotta do what we gotta do." SILVERSTEIN responded, in relevant part: "Oh no, 100%, but he happens to say 'get ready' | He told me this: 'when the next one is, we have a lot more leniency...because it's not...with him.'"

294.    On or about November 29, 2023, in discussing NOURAFCHAN's efforts to obtain a job working at a public relations firm with a mergers and acquisitions practice ("Public Relations Firm A"), NOURAFCHAN told YADGAROV during a phone call, in relevant part: "They do $20 billion a year; did they do $169 billion in deals a year?" YADGAROV responded: "Oh my god." NOURAFCHAN replied, in relevant part: "I know, [Public Relations Firm A] does $20 billion; that's all we need, bro. That's all we need. $20 billion is all we need."

295.    On or about January 9, 2024, NOURAFCHAN, during a phone call with YADGAROV, stated, in relevant part: "Hopefully with Cuz it'll happen first | And then uh, cause [CC-4] is geared up, and this uh, this loser Gavy says he's geared up, that one you don't have to handle, I'm not letting you handle that anymore."

296.    On or about February 15, 2024, S. FENSTERSZAUB, during a phone call with SILVERSTEIN, stated, in relevant prat: "I'm waiting for your boy to get a job." SILVERSTEIN responded, in relevant part: "Yeah he interviewed at, like, a bunch of places. He's waiting to hear back. He, listen | Listen, the fact of the matter is he's done this forever, so, like, he's hurting. You understand?"

297.    On or about March 8, 2024, after S. FENSTERZAUB told SILVERSTEIN during a phone call, "Dude we need a flight that's what we need, we need a flight | we need a couple shekels," SILVERSTEIN responded, in relevant part: "It's amazing how he just only works in those type of firms f*cking hilarious I mean it's the only reason why he did it that type of law, f*cking genius." S. FENSTERSZAUB responded: "Genius." SILVERSTEIN replied: "Yeah, seriously. He really is."

298.    On or about March 12, 2024, an undercover law enforcement agent posing as a representative of a securities regulatory authority called B. FENSTERSZAUB. During the call,

B. FENSTERSZAUB attempted to conceal the nature and existence of the scheme by falsely stating that he did not know any individuals, directly or indirectly, who worked at one of the law firms that advised on the acquisitions of iRobot or Momentive. B. FENSTERSZAUB then called SILVERSTEIN and stated, in relevant part: "I just got a terrible call...We might need a...we might need a meeting. I got a call from FINRA, the Securities Exchange Commission." After SILVERSTEIN said "shut up," and asked what the call was about, B. FENSTERSZAUB said: "About some trades in iRobot and Momentive and some other things that were | Yeah a whole bunch of acquisitions." SILVERSTEIN responded: "Holy sh*t. | That is the most nauseating thing I have ever heard." Later during the call, B. FENSTERSZAUB stated, in relevant part: "I didn't like it from the beginning. The same f*cking bullsh*t and all for what," and later, "I know it's nauseating for you cause if I know, and I said this from the f*cking beginning I didn't like it | That's what I've always said from the beginning it doesn't matter what you say even if you could get away with it..." Later during the call, B. FENSTERSZAUB stated, in relevant part: "You don't want too many fingers pointing back to you. You know what I'm saying? Mine is a joke I don't know if other people...I'm just saying you gotta be very f*cking careful. Like even, even what's his name remembers Simon told the universe...Listen God forbid that I don't think anything should come of it but God forbid if something did you don't need it pointing back to you and you having to deal with it." SILVERSTEIN responded, in relevant part: "That is scary and nauseating...Run away. 'Run Forest run.'"

299.    On or about March 12, 2024, after an undercover law enforcement agent posing as a representative of a securities regulatory authority called B. FENSTERSZAUB a second time, and B. FENSTERSZAUB falsely stated that he did not discuss Momentive or iRobot with

SILVERSTEIN, B. FENSTERSZAUB immediately called SILVERSTEIN to arrange an in-person meeting.

300. On or about March 13, 2024, an undercover law enforcement agent posing as a representative of a securities regulatory authority called SILVERSTEIN and asked, "[h]ave you ever provided investment advice or talked with any other individuals about whether or not they should purchase those two stocks: iRobot or Momentive?" SILVRSTEIN attempted to conceal the nature and existence of the conspiracy by falsely stating, "I don't even know what that is." When asked whether he knew iRobot and Momentive, SILVERSTEIN stated: "No. No, not at all." When asked whether SILVERSTEIN told other individuals to buy certain stocks, SILVERSTEIN responded: "No. I don't know anything about stocks or anything like that." SILVERSTEIN falsely stated that he did not know anyone who was employed by one of the law firms that worked on the acquisitions of iRobot or Momentive, and when asked whether SILVERSTEIN knew any lawyers who worked in mergers and acquisitions at all, SILVERSTEIN falsely responded: "uhh, no I don't."

301. On or about May 6, 2024, after CC-1 misappropriated MNPI regarding a potential acquisition of Enstar from Law Firm E and provided the MNPI to YADGAROV, YADGAROV provided the MNPI to NOURAFCHAN.

302. On or about May 7, 2024, after NOURAFCHAN provided MNPI regarding a potential acquisition of Enstar to SILVERSTEIN, SUSKIND purchased Enstar securities while in possession of MNPI.

303. On or about May 7, 2024, after NOURAFCHAN provided the MNPI regarding a potential acquisition of Enstar to CC-4, C-4 purchased Enstar securities while in possession of MNPI.

304. On or about May 13, 2024, after NOURAFCHAN provided MNPI regarding a potential acquisition of Enstar to SILVERSTEIN, HOROWITZ purchased Enstar securities while in possession of MNPI.

## Overview of the Money Laundering Conspiracy

305. Beginning no later than in or about March 2014 and continuing through at least in or about August 2024, FEJAL, B. FENSTERSZAUB, M. FENSTERSZAUB, S. FENSTERSZAUB, GAVRILOV, HATANIAN, HOROWITZ, IZRAELOV, MORADI, NOURAFCHAN, OSTROV, SALZBERG, SHILIAN, SILVERSTEIN, SUSKIND, YADGAROV, CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, CC-8, CC-9, CC-10, CC-11, CC-12, CC-13, CC-14, and CC-15 conspired with each other, and with others known and unknown to the Grand Jury, to engage in financial transactions, knowing that the property involved in the transactions represented the proceeds of securities fraud, and knowing that the transactions were designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds of securities fraud.

## Objects and Purposes of the Money Laundering Conspiracy

306. The object of the conspiracy was to commit money laundering. The principal purposes of the conspiracy were to conceal and disguise the nature, location, source, ownership, and control of the securities fraud proceeds, and to conceal the conspirators' actions from others, including regulators and law enforcement.

## Manner and Means of the Money Laundering Conspiracy

307. Among the manner and means by which FEJAL, B. FENSTERSZAUB, M. FENSTERSZAUB, S. FENSTERSZAUB, GAVRILOV, HATANIAN, HOROWITZ, IZRAELOV, MORADI, NOURAFCHAN, OSTROV, SALZBERG, SHILIAN, SILVERSTEIN,

53

SUSKIND, YADGAROV, CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, CC-8, CC-9, CC-10, CC-11, CC-12, CC-13, CC-14, CC-15, and others known and unknown to the Grand Jury carried out the conspiracy were the following:

a. Obtaining MNPI about forthcoming M&A transactions and other confidential corporate matters from law firms, including by viewing confidential documents on law firms' document management systems, including documents that NOURAFCHAN accessed that were stored on a Law Firm C server located in the District of Massachusetts;

b. Misappropriating and sharing that MNPI, in violation of the duties of loyalty, trust, and confidence that the attorneys, including NOURAFCHAN, owed to the sources of the MNPI, including the attorneys' employers and their clients, as well as in violation of insider trading and confidentiality policies that the attorneys, including NOURAFCHAN, were bound by;

c. Recruiting co-conspirators who agreed to trade in the securities of public companies while in possession of MNPI on behalf of their tippers, and in exchange for an agreement to share in and kickback a portion of the profits generated by their insider trading and other benefits, and who agreed to recruit other traders to do the same;

d. Trading in the securities of those companies while in possession of MNPI and knowing that the MNPI was obtained in breach of a duty that the sources of the information owed, including trades executed over a securities exchange located in Boston, Massachusetts;

e.  Using ledgers to track illicit trading proceeds and kickback payment amounts;

f.  Transferring proceeds of the illicit trading to corporate insiders and other co-conspirators, directly and indirectly, in cash and other transactions designed to conceal and disguise the nature, location, source, ownership, and control of the insider trading proceeds; and

g.  lying to and misleading banks and brokerage firms about the sources of information and reasons for securities trading, cash withdrawals, wire transfers, and other payments; and

h.  Taking steps to conceal the conspiracy from regulators and law enforcement, including by: communicating about the MNPI in person and via encrypted messaging applications; instructing co-conspirators during in-person meetings to turn off and put away phones and other wearable electronics; enlisting other individuals to trade on the behalf of co-conspirators; creating and trading in brokerage accounts in the names of shell companies; trading in foreign brokerage accounts to attempt to evade the supervision of U.S. securities regulators; using coded language and foreign languages, including code words related to travel, flights, religion, and religious instruction to refer to trading, MNPI, and money; using code names for co-conspirators; using burner phones and phones of other individuals; transferring proceeds in cash, through shell companies, and through intermediaries; disguising kickback payments as purported "loans"; creating false explanations and sham research to substantiate trading

decisions; and lying to law enforcement, securities regulators, brokerage firms, and law firms.

Overt Acts in Furtherance of the Money Laundering Conspiracy

308.    Beginning no later than in or about March 2014 and continuing through at least in or about August 2024, FEJAL, B. FENSTERSZAUB, M. FENSTERSZAUB, S. FENSTERSZAUB, GAVRILOV, HATANIAN, HOROWITZ, IZRAELOV, MORADI, NOURAFCHAN, OSTROV, SALZBERG, SHILIAN, SILVERSTEIN, SUSKIND, YADGAROV, CC-1, CC-2, CC-3, CC-4, CC-5, CC-6, CC-7, CC-8, CC-9, CC-10, CC-11, CC-12, CC-13, CC-14, CC-15, and others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, including all of the overt acts alleged in paragraphs 74 through 304 above, in furtherance of the money laundering conspiracy:

309.    Between in or about 2014 and in or about 2019, GAVRILOV made a stream of payments, including cash payments and other payments designed to conceal their nature, to or for the benefit of YADGAROV, totaling more than $6.3 million, some of which YADGAROV then paid to or for the benefit of sources of the MNPI, including NOURAFCHAN, CC-1, and CC-2.

310.    For example, on or about March 13, 2017, GAVRILOV, through a shell company formed in Panama that he controlled, sent approximately $485,000 from a Swiss bank account to a real estate attorney for YADGAROV to purchase real estate in New York in the name of a shell company that YADGAROV controlled.

311.    As a further example, on or about December 26, 2017, GAVRILOV, through a shell company formed in Switzerland that he controlled, sent approximately $1.5 million to a different shell company that YADGAROV controlled.

312.    On or about December 27, 2017, YADGAROV, through a shell company, sent approximately $300,000 to a real estate attorney for NOURAFCHAN to purchase real estate in New York.

313.    On or about the same day, December 27, 2017, YADGAROV, through a shell company, sent approximately $400,000 to a bank account in the name of a family member of NOURAFCHAN.

314.    On or about the following day, December 28, 2017, YADGAROV withdrew approximately $150,000 in cash from the bank account of a shell company he controlled and gave a cash payment to CC-2.

315.    As a further example, on or about February 13, 2018, GAVRILOV, through a shell company formed in Switzerland that he controlled, sent approximately $500,000 to a shell company that YADGAROV controlled.

316.    In or about August 2019, YADGAROV gave CC-1 a cash payment.

317.    In or about March 2020, CC-3 gave YADGAROV a cash payment.

318.    On or about August 27 and September 1, 2020, HOROWITZ, through a company he controlled, made payments to SILVERSTEIN.

319.    On or about September 16, 2020, SILVERSTEIN, for the benefit of NOURAFCHAN, made a payment to an individual to whom NOURAFCHAN owed money.

320.    On or about March 16, 2022, IZRAELOV sent a payment from an account that he controlled in the name of Queen Street Finance to an account that he controlled in the name of Witsand Trading Ltd.

321.    On or about May 4, 2022, CC-3 gave YADGAROV a cash payment.

322.    On or about June 17, 2022, S. FENSTERSZAUB messaged HATANIAN: "I hope to find out today when the Rabbi's surgery is going to take place." HATANIAN responded: "ok please let me know – i am praying!"

323.    In or about August 2022, CC-8 gave CC-6 a cash payment.

324.    In or about August 2022, MORADI gave CC-6 a cash payment.

325.    In or about August 2022, FEJAL gave CC-6 a cash payment.

326.    In or about August 2022, SHILIAN, through a family member, gave CC-6 a cash payment.

327.    In or about August 2022, CC-6 gave S. FENSTERSZAUB a cash payment.

328.    On or about August 8 and 10, 2022, HOROWITZ made payments to SILVERSTEIN.

329.    On or about August 10, 2022, CC-10 made a payment to M. FENSTERSZAUB to give to SILVERSTEIN.

330.    On or about August 12, 2022, SILVERSTEIN messaged M. FENSTERSZAUB: "And my old friend coming in the week of the 20th. He's coming for shirayim."

331.    Between on or about August 4, 2022 and on or about August 31, 2022, M. FENSTERSZAUB made several payments to SILVERSTEIN.

332.    On or about August 15, 2022, OSTROV messaged S. FENSTERSZAUB that he was sending S. FENSTERSZAUB a payment and sent him a payment.

333.    On or about August 15, 2022, the same day that SALZBERG sent S. FENSTERSZAUB a payment, SALZBERG messaged S. FENSTERSZAUB: "just sent you a gift. Thank you so, so, so much. Really appreciate it. Um, really, really. Thank you so much, Simon." S. FENSTERSZAUB responded with a thumbs up emoji.

334. On or about August 26, 2022, and August 29, 2022, S. FENSTERSZAUB made payments to SILVERSTEIN.

335. On or about August 30, 2022, CC-7, through a company he controlled, made a payment to S. FENSTERSZAUB.

336. On or about August 31, 2022, B. FENSTERSZAUB messaged SUSKIND "need scrilla fool."

337. On or about September 1, 2022, SUSKIND gave B. FENSTERSZAUB a cash payment.

338. On or about March 16, 2023, HOROWITZ sent a payment to SILVERSTEIN through a company HOROWITZ controlled.

339. On or about March 17, 2023, SILVERSTEIN messaged HOROWITZ regarding CC-5, to whom HOROWITZ had passed MNPI: "[CC-5's name] needs to give you 1500 from me."

340. On or about March 17, 2023, S. FENSTERSZAUB sent CC-6 bank account information for a company S. FENSTERSZAUB controlled for CC-6 to provide other traders for S. FENSTERSZAUB to receive kickback payments, and S. FENSTERSZAUB messaged CC-6: "just put business loan in the memo section."

341. On or about March 17, 2023, after CC-8 sent a payment to S. FENSTERSZAUB, S. FENSTERSZAUB messaged CC-6: "I got from [CC-8's name]."

342. On or about March 17, 2023, S. FENSTERSZAUB sent a payment to SILVERSTEIN.

343. On or about March 24, 2023, after CC-7 messaged S. FENSTERSZAUB, "I was told to make a special delivery," CC-7 gave a cash payment to S. FENSTERSZAUB.

344.    On or about September 12, 2023, SUSKIND gave B. FENSTERSZAUB a cash payment.

345.    On or about October 16, 2023, B. FENSTERSZAUB told SILVERSTEIN on a phone call, in relevant part: "I'm sure you could also use the money, I could use the money, I was thinking, should we just juice whatever's left of the crop?" SILVERSTEIN responded, in relevant part: "What if he comes here, he said he might come in a couple weeks." B. FENSTERSZAUB replied, in relevant part: "Believe me, I know and I know.  I know and I know.  And I'm always the one that's like on top of that for him.  I actually get upset for him." SILVERSTEIN responded, in relevant part: "Because we're going to have to give him $15,000 dollars cash at some point."

346.    On or about October 18, 2023, at the direction of NOURAFCHAN and YADGAROV, CC-14 met with CC-4 and received a cash payment from CC-4.

347.    On or about October 18, 2023, after receiving a cash payment from CC-4, CC-14 messaged NOURAFCHAN: "AED 248,400 / 3.67 =$67,684 received Oct 18, 2023 | Bro [CC-4] and I just met, all with me, I'm back mid November, and will pick up and give to Rob."

348.    On or about October 18, 2023, CC-14 sent to YADGAROV the same October 18 message that he had sent to NOURAFCHAN.

349.    On or about November 7, 2023, B. FENSTERSZAUB asked SILVERSTEIN on a phone call, in relevant part: "And then what's with, what with uhhh Rabbi Pipestein." SILVERSTEIN responded, in relevant part: "Pipestein is coming on Thursday, whether we like it or not to collect." B. FENSTERSZAUB replied, in relevant part: "Good, good.  So the question, how much are we giving him?  And how are we giving him?" SILVERSTEIN responded, in relevant part: "I have no idea, but honestly, as much as we can get.  I mean, he asked me a week ago, if I have it all.  I said, 'of course.'  I'm not going to say 'no.'" During a discussion of how to

60

pay the money, B. FENSTERSZAUB said, in relevant part: "Unless he had someone, or some business that we could, we could, you know, could do some work, do some marketing for us." SILVERSTEIN responded, in relevant part: "Are you kidding me? He wants, cash is always the way he wants." Later during the call, during a discussion about not having enough money to pay, B. FENSTERSZAUB said: "Listen, worst comes to worst, if we, really, if it really doesn't work out on time, we'll just have to take a trip to L.A., maybe me and you will go overnight to L.A. for a night or something." SILVERSTEIN responded, in relevant part: "I had no choice. I couldn't be like, 'yeah I spent it.'" Later during the call, B. FENSTERSZAUB stated, in relevant part: "Did he, did you give him an amount yet or no?" SILVERSTEIN responded, in relevant part: "Oh he knows. He's getting 15. I told him. He asked a while ago." Later during the call, B. FENSTERSZAUB stated, in relevant part: "We're playing with fire. We have enough problems as it is. If you think about our situation, it's the craziest thing in the world, look up—go online and Google 'S-A-R'. And you'll see what I'm talking about…and by the way, they're very tricky, banks. They'll be like, if they see a pattern of withdrawals or, if they see close to $10,000, there's no set rule when they have to send it. They send it whenever they want. And that's the last thing we need."

350.    On or about November 8, 2023, during a phone call during which SILVERSTEIN discussed with B. FENSTERSZAUB pawning SILVERSTEIN's Rolex watch to CC-12 to obtain cash to make a payment, and whether to obtain the money via cash or a transfer from CC-12, SILVERSTEIN stated: "Um, the only thing is he's not even talking about cash, he wants to wire it to my bank." B. FENSTERSZAUB responded, in relevant part: "Here's what I don't like about it, I don't like that if he does that you have to pay this guy right away and take it all out, I don't like that. I don't like for—it's ten times worse for Mason, but it's still not good for you if there's

61

an S-A-R." SILVERSTEIN responded, in relevant part: "I can't do that, I would have to uh like send you like two or three grand to take out, ya know?"

351.    On or about November 9, 2023, SILVERSTEIN pawned his Rolex watch to CC-12 in exchange for cash to make a payment for the benefit of NOURAFCHAN.

352.    On or about November 9, 2023, SILVERSTEIN gave a $12,000 cash payment to CC-15 to give to NOURAFCHAN.

353.    On or about November 28, 2023, NOURAFCHAN told SILVERSTEIN on a phone call, in relevant part: "There's nothing now, but I'm trying to get a job and there's a couple opportunities that I'm looking at. If I get a job soon, it'll be good." SILVERSTEIN responded, in relevant part: "Nice | but you have another chavrusa." NOURAFCHAN replied, in relevant part: "No that chavrusa isn't...is not happening | We missed the boat. We missed the boat...Oh the chavrusa! Oh yeah I have another chavrusa |...that's one of the things I am waiting for...| Yeah chavrusa. Obviously that's the best case scenario we got | that's what I mean, even better, you know." Later during the call, NOURAFCHAN stated, in relevant part: "Bro there's 3k balance, no?" SILVERSTEIN responded: "yeah, 100 percent." NOURAFCHAN replied: "Can you send it to uhhhh..." SILVERSTEIN responded: "Ralph Snyder?" NOURAFCHAN responded: Yeah." Later during the call, SILVERSTEIN stated, in relevant part: "And if ahh good parasha you know what I mean? It'll be beautiful." NOURAFCHAN replied, in relevant part: "Obviously dude, obviously. You just get everything set up on your end, so we finally get one normal one."

354.    On or about November 29, 2023, NOURAFCHAN told YADGAROV on a phone call, in relevant part: "Bro listen Gavy is going to send you 3k tomorrow." YADGAROV responded, in relevant part: "Ok." NOURAFCHAN replied, in relevant part: "To cover the

balance of the car." YADGAROV responded: "Ok." NOURAFCHAN replied, in relevant part: "Just, just, just to switch up." Later during the call, NOURAFCHAN stated, in relevant part: "Listen, um, the guy who's sending you the money that I told you about for the car. He said he's all set up, for, for, for when Cuz comes around."

355. On or about November 30, 2023, NOURAFCHAN messaged SILVERSTEIN: "Today?" SILVERSTEIN responded: "Unfortunately not. God willing tomorrow. Sorry." NOURAFCHAN replied: "Ok bzh. Bro for next time let's make it smoother please. I don't like chasing."

356. In or about December 2023, YADGAROV gave CC-2 a cash payment.

357. On or about December 12, 2023, before NOURAFCHAN had a meeting with CC-2, during a phone call, YADGAROV told NOURAFCHAN, in relevant part: "You should see him, and just let him know, I'm looking forward to uh, to the next one."

358. On or about December 14, 2023, during a phone call discussing SILVERSTEIN sending money, NOURAFCHAN told SILVERSTEIN: "Bro, but you understand, that, that, that it can't be like this, right? | Like for the future, right? This happens every single time." Later during the call, NOURAFCHAN stated, in relevant part: "If we're gonna do the big one, we gotta, I, we need, we need to, we need to sit down with everybody, with everybody, I'm saying, in advance, I'll send, I'll send one of my representatives | and we'll sit down in advance and, and we'll talk about how we're gonna do it on the back end. You understand what I'm saying?" Later during the call, NOURAFCHAN stated, in relevant part: "Alright, bro, anyway, I'm working on getting a job. So Baruch hashem | we'll have more." SILVERSTEIN replied: "The other chavrusa would be nice to learn with. The other chavrusa." NOURAFCHAN responded: "Yeah, yeah. But right now I—right now I'm not working, you understand that, so there's no chavrusas right now."

359.    On or about December 29, 2023 and January 2, 2024, SILVERSTEIN sent payments to YADGAROV.

360.    On or about August 19, 2024, YADGAROV gave CC-1 a cash payment.

COUNT ONE
Securities Fraud Conspiracy
(18 U.S.C. § 1349)

The Grand Jury charges:

361.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

362.    From in or about at least March 2014 through in or about at least August 2024, in the District of Massachusetts and elsewhere, the defendants,

(1)    PEDRAM FEJAL,

(2)    BRIAN FENSTERSZAUB,

(3)    MARK FENSTERSZAUB,

(4)    SIMON FENSTERSZAUB,

(5)    ILYA GAVRILOV,

(6)    BARUCH IGAL HATANIAN,

(7)    YISROEL HOROWITZ,

(8)    GOD IZRAELOV,

(9)    DAVID MORADI,

(10)    NICOLO NOURAFCHAN,

(11)    DAVID OSTROV,

(12)    YECHIEL SALZBERG,

(13)    ABRAHAM SHILIAN,

(14)    GAVRYEL SILVERSTEIN,

(15)    JOSEPH SUSKIND, and

(16)    ROBERT YADGAROV,

65

conspired with one another, and with others known and unknown to the Grand Jury, to commit securities fraud, that is, to knowingly execute and attempt to execute a scheme and artifice (a) to defraud persons in connection with securities of issuers with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, including Anadarko Petroleum Corporation; Ardagh Group SA; Berkshire Grey, Inc.; Care.com, Inc.; Citrix Systems, Inc.; C.R. Bard, Inc.; DSP Group, Inc.; Enstar Group Limited; Express Scripts Holding Company; Glimcher Realty Trust; Innophos Holdings, Inc.; IPC Healthcare Inc.; iRobot Corporation; KnowBe4, Inc.; Momenta Pharmaceuticals, Inc.; Momentive Global Inc.; Neustar, Inc.; NextGen Healthcare, Inc.; Orchard Therapeutics PLC; Plantronics Inc.; Poshmark, Inc.; Qualcomm Incorporated; Qualtrics International Inc.; SailPoint Technologies Holdings, Inc.; Taubman Centers, Inc.; Tim Hortons Inc.; and ZAGG Inc.; and (b) to obtain, by means of false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of issuers with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, including Anadarko Petroleum Corporation; Ardagh Group SA; Berkshire Grey, Inc.; Care.com, Inc.; Citrix Systems, Inc.; C.R. Bard, Inc.; DSP Group, Inc.; Enstar Group Limited; Express Scripts Holding Company; Glimcher Realty Trust; Innophos Holdings, Inc.; IPC Healthcare Inc.; iRobot Corporation; KnowBe4, Inc.; Momenta Pharmaceuticals, Inc.; Momentive Global Inc.; Neustar, Inc.; NextGen Healthcare, Inc.; Orchard Therapeutics PLC; Plantronics Inc.; Poshmark, Inc.; Qualcomm Incorporated; Qualtrics International Inc.; SailPoint Technologies Holdings, Inc.; Taubman Centers, Inc.; Tim Hortons Inc.; and ZAGG Inc., in that FEJAL, BRIAN FENSTERSZAUB, MARK FENSTERSZAUB, SIMON FENTERSZAUB, GAVRILOV, HATANIAN, HOROWITZ, IZRAELOV, MORADI, NOURAFCHAN, OSTROV, SALZBERG, SHILIAN, SILVERSTEIN, SUSKIND, and YADGAROV traded in the securities of those

companies while in possession of material non-public information and provided material non-public information to other co-conspirators so that they could trade in the securities of those companies, in violation of Title 18, United States Code, Section 1348.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO
Securities Fraud Conspiracy
(18 U.S.C. § 371)

The Grand Jury charges:

363.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

364.    From in or about at least March 2014 through in or about at least August 2024, in the District of Massachusetts and elsewhere, the defendants,

(1)    PEDRAM FEJAL,

(2)    BRIAN FENSTERSZAUB,

(3)    MARK FENSTERSZAUB,

(4)    SIMON FENSTERSZAUB,

(5)    ILYA GAVRILOV,

(6)    BARUCH IGAL HATANIAN,

(7)    YISROEL HOROWITZ,

(8)    GOD IZRAELOV,

(9)    DAVID MORADI,

(10)    NICOLO NOURAFCHAN,

(11)    DAVID OSTROV,

(12)    YECHIEL SALZBERG,

(13)    ABRAHAM SHILIAN,

(14)    GAVRYEL SILVERSTEIN,

(15)    JOSEPH SUSKIND, and

(16)    ROBERT YADGAROV,

conspired with one another, and with others known and unknown to the Grand Jury, to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, that is, knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly to use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and to (a) employ a device, scheme, and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities, including Actelion Ltd.; Adevinta ASA; Anadarko Petroleum Corporation; Ardagh Group SA; Berkshire Grey, Inc.; Care.com, Inc.; Citrix Systems, Inc.; C.R. Bard, Inc.; DSP Group, Inc.; Enstar Group Limited; Express Scripts Holding Company; Glimcher Realty Trust; Innophos Holdings, Inc.; IPC Healthcare Inc.; iRobot Corporation; KnowBe4, Inc.; Momenta Pharmaceuticals, Inc.; Momentive Global Inc.; Neustar, Inc.; NextGen Healthcare, Inc.; Orchard Therapeutics PLC; Plantronics Inc.; Poshmark, Inc.; Qualcomm Incorporated; Qualtrics International Inc.; SailPoint Technologies Holdings, Inc.; Taubman Centers, Inc.; Tim Hortons Inc.; and ZAGG Inc.

All in violation of Title 18, United States Code, Section 371.

COUNT THREE
Securities Fraud; Aiding and Abetting
(18 U.S.C. §§ 1348 and 2)

The Grand Jury charges:

365.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

366.    On various dates between on or about March 1, 2014 and on or about August 31, 2024, in the District of Massachusetts and elsewhere, the defendants,

(1)    PEDRAM FEJAL,

(2)    BRIAN FENSTERSZAUB,

(3)    MARK FENSTERSZAUB,

(4)    SIMON FENSTERSZAUB,

(5)    ILYA GAVRILOV,

(6)    BARUCH IGAL HATANIAN,

(7)    YISROEL HOROWITZ,

(8)    GOD IZRAELOV,

(9)    DAVID MORADI,

(10)    NICOLO NOURAFCHAN,

(11)    DAVID OSTROV,

(12)    YECHIEL SALZBERG,

(13)    ABRAHAM SHILIAN,

(14)    GAVRYEL SILVERSTEIN,

(15)    JOSEPH SUSKIND, and

(16)    ROBERT YADGAROV,

knowingly executed, and attempted to execute, a scheme and artifice (a) to defraud persons in connection with securities of issuers with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, including Anadarko Petroleum Corporation; Ardagh Group SA; Berkshire Grey, Inc.; Care.com, Inc.; Citrix Systems, Inc.; C.R. Bard, Inc.; DSP Group, Inc.; Enstar Group Limited; Express Scripts Holding Company; Glimcher Realty Trust; Innophos Holdings, Inc.; IPC Healthcare Inc.; iRobot Corporation; KnowBe4, Inc.; Momenta Pharmaceuticals, Inc.; Momentive Global Inc.; Neustar, Inc.; NextGen Healthcare, Inc.; Orchard Therapeutics PLC; Plantronics Inc.; Poshmark, Inc.; Qualcomm Incorporated; Qualtrics International Inc.; SailPoint Technologies Holdings, Inc.; Taubman Centers, Inc.; Tim Hortons Inc.; and ZAGG Inc.; and (b) to obtain, by means of false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of issuers with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, including Anadarko Petroleum Corporation; Ardagh Group SA; Berkshire Grey, Inc.; Care.com, Inc.; Citrix Systems, Inc.; C.R. Bard, Inc.; DSP Group, Inc.; Enstar Group Limited; Express Scripts Holding Company; Glimcher Realty Trust; Innophos Holdings, Inc.; IPC Healthcare Inc.; iRobot Corporation; KnowBe4, Inc.; Momenta Pharmaceuticals, Inc.; Momentive Global Inc.; Neustar, Inc.; NextGen Healthcare, Inc.; Orchard Therapeutics PLC; Plantronics Inc.; Poshmark, Inc.; Qualcomm Incorporated; Qualtrics International Inc.; SailPoint Technologies Holdings, Inc.; Taubman Centers, Inc.; Tim Hortons Inc.; and ZAGG Inc., in that FEJAL, BRIAN FENSTERSZAUB, MARK FENSTERSZAUB, SIMON FENTERSZAUB, GAVRILOV, HATANIAN, HOROWITZ, IZRAELOV, MORADI, NOURAFCHAN, OSTROV, SALZBERG, SHILIAN, SILVERSTEIN, SUSKIND, and YADGAROV traded in the securities of those companies while in possession of material non-public information and provided material non-

public information to other co-conspirators so that they could trade in the securities of those companies.

All in violation of Title 18, United States Code, Section 1348.

COUNT FOUR
Securities Fraud; Aiding and Abetting
(15 U.S.C. § 78j(b) and 78ff(a); 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)

The Grand Jury charges:

367.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

368.    On various dates between on or about March 1, 2014 and on or about August 31, 2024, in the District of Massachusetts and elsewhere, the defendants,

(1)    PEDRAM FEJAL,

(2)    BRIAN FENSTERSZAUB,

(3)    MARK FENSTERSZAUB,

(4)    SIMON FENSTERSZAUB,

(5)    ILYA GAVRILOV,

(6)    BARUCH IGAL HATANIAN,

(7)    YISROEL HOROWITZ,

(8)    GOD IZRAELOV,

(9)    DAVID MORADI,

(10)    NICOLO NOURAFCHAN,

(11)    DAVID OSTROV,

(12)    YECHIEL SALZBERG,

(13)    ABRAHAM SHILIAN,

(14)    GAVRYEL SILVERSTEIN,

(15)    JOSEPH SUSKIND, and

(16)    ROBERT YADGAROV,

73

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme, and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities, including Actelion Ltd.; Adevinta ASA; Anadarko Petroleum Corporation; Ardagh Group SA; Berkshire Grey, Inc.; Care.com, Inc.; Citrix Systems, Inc.; C.R. Bard, Inc.; DSP Group, Inc.; Enstar Group Limited; Express Scripts Holding Company; Glimcher Realty Trust; Innophos Holdings, Inc.; IPC Healthcare Inc.; iRobot Corporation; KnowBe4, Inc.; Momenta Pharmaceuticals, Inc.; Momentive Global Inc.; Neustar, Inc.; NextGen Healthcare, Inc.; Orchard Therapeutics PLC; Plantronics Inc.; Poshmark, Inc.; Qualcomm Incorporated; Qualtrics International Inc.; SailPoint Technologies Holdings, Inc.; Taubman Centers, Inc.; Tim Hortons Inc.; and ZAGG Inc.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

74

COUNT FIVE
Money Laundering Conspiracy
(18 U.S.C. § 1956(h))

The Grand Jury charges:

369.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

370.    From in or about at least March 2014 through in or about at least August 2024, in the District of Massachusetts and elsewhere, the defendants,

(1)    PEDRAM FEJAL,

(2)    BRIAN FENSTERSZAUB,

(3)    MARK FENSTERSZAUB,

(4)    SIMON FENSTERSZAUB,

(5)    ILYA GAVRILOV,

(6)    BARUCH IGAL HATANIAN,

(7)    YISROEL HOROWITZ,

(8)    GOD IZRAELOV,

(9)    DAVID MORADI,

(10)  NICOLO NOURAFCHAN,

(11)  DAVID OSTROV,

(12)  YECHIEL SALZBERG,

(13)  ABRAHAM SHILIAN,

(14)  GAVRYEL SILVERSTEIN,

(15)  JOSEPH SUSKIND, and

(16)  ROBERT YADGAROV,

conspired with one another, and with others known and unknown to the Grand Jury, to conduct and attempt to conduct financial transactions, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and which in fact involved the proceeds of specified unlawful activity, that is, securities fraud, in violation of Title 18, United States Code, Section 1348, Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, as charged in Counts Three and Four, and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 1956(h).

76

## COUNT SIX
False Statements
(18 U.S.C. § 1001(a)(2))

The Grand Jury charges:

371.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

372.    On or about September 10, 2024, in the District of Massachusetts and elsewhere, the defendant,

(3)    MARK FENSTERSZAUB,

in a matter within the jurisdiction of the executive branch of the Government of the United States, specifically, an investigation by the Federal Bureau of Investigation concerning MARK FENSTERSZAUB's securities fraud and money laundering, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, to wit: that MARK FENSTERSZAUB did not receive stock information from GAVRYEL SILVERSTEIN; and that MARK FENSTERSZAUB did not pay GAVRYEL SILVERSTEIN for stock information.

All in violation of Title 18, United States Code, Section 1001(a)(2).

<u>COUNT SEVEN</u>
False Statements
(18 U.S.C. § 1001(a)(2))

The Grand Jury charges:

373.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

374.    On or about December 9, 2024, in the District of Massachusetts and elsewhere, the defendant,

(9)    DAVID MORADI,

in a matter within the jurisdiction of the executive branch of the Government of the United States, specifically, an investigation by the Federal Bureau of Investigation concerning DAVID MORADI's securities fraud and money laundering, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, to wit: that MORADI did not know that CC-6 had MNPI regarding stocks; that MORADI did not trade any stocks knowing that the company was going to be acquired; that CC-6 did not tell MORADI to buy stocks based on MNPI that the company was going to be acquired; and that MORADI did not pay anyone for stock information.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT EIGHT
False Statements
(18 U.S.C. § 1001(a)(2))

The Grand Jury charges:

375.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

376.    On or about September 10, 2024, in the District of Massachusetts and elsewhere, the defendant,

(15)    JOSEPH SUSKIND,

in a matter within the jurisdiction of the executive branch of the Government of the United States, specifically, an investigation by the Federal Bureau of Investigation concerning JOSEPH SUSKIND's securities fraud and money laundering, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, to wit: that SUSKIND did not make payments to BRIAN FENSTERSZAUB in exchange for stock information.

All in violation of Title 18, United States Code, Section 1001(a)(2).

COUNT NINE
Obstruction of Justice
(18 U.S.C. § 1512(b)(3))

The Grand Jury charges:

377.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

378.   From on or about July 22, 2025 through on or about July 30, 2025, in the District of Massachusetts and elsewhere, the defendant,

(10)   NICOLO NOURAFCHAN,

did engage in corrupt persuasion and corruptly persuaded another person, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a Federal offense, that is, the insider trading scheme and securities fraud and money laundering conspiracies described in paragraphs 1 through 360 of this Indictment, to wit: NOURAFCHAN instructed CC-4 to falsely tell federal law enforcement officers that he did not know anything about the insider trading scheme and to not answer federal law enforcement officers' questions about the insider trading scheme.

All in violation of Title 18, United States Code, Section 1512(b)(3).

COUNT TEN
Obstruction of Justice; Aiding and Abetting
(18 U.S.C. §§ 1512(c)(1) and 2)

The Grand Jury charges:

379.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 360 of this Indictment.

380.    On or about July 30, 2025, in the District of Massachusetts and elsewhere, the defendant,

(10)    NICOLO NOURAFCHAN,

did knowingly, intentionally, and corruptly alter, destroy, mutilate, and conceal a record, document, and other object, and did attempt to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, namely, a federal Grand Jury investigation in the District of Massachusetts investigating the insider trading scheme and securities fraud and money laundering conspiracies described in paragraphs 1 through 360 of this Indictment, to wit: NOURAFCHAN instructed CC-4 to delete evidence from CC-4's phone, including communications between NOURAFCHAN and CC-4.

All in violation of Title 18, United States Code, Sections 1512(c)(1) and 2.

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

381.    Upon conviction of one or more of the offenses charged in Counts One, Two, Three, and Four, the defendants,

(1)    PEDRAM FEJAL,

(2)    BRIAN FENSTERSZAUB,

(3)    MARK FENSTERSZAUB,

(4)    SIMON FENSTERSZAUB,

(5)    ILYA GAVRILOV,

(6)    BARUCH IGAL HATANIAN,

(7)    YISROEL HOROWITZ,

(8)    GOD IZRAELOV,

(9)    DAVID MORADI,

(10)    NICOLO NOURAFCHAN,

(11)    DAVID OSTROV,

(12)    YECHIEL SALZBERG,

(13)    ABRAHAM SHILIAN,

(14)    GAVRYEL SILVERSTEIN,

(15)    JOSEPH SUSKIND, and

(16)    ROBERT YADGAROV,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

382.    If any of the property described in paragraph 381, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in paragraph 381 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## MONEY LAUNDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

383.    Upon conviction of the offense charged in Count Five, the defendants,

(1)    PEDRAM FEJAL,

(2)    BRIAN FENSTERSZAUB,

(3)    MARK FENSTERSZAUB,

(4)    SIMON FENSTERSZAUB,

(5)    ILYA GAVRILOV,

(6)    BARUCH IGAL HATANIAN,

(7)    YISROEL HOROWITZ,

(8)    GOD IZRAELOV,

(9)    DAVID MORADI,

(10)    NICOLO NOURAFCHAN,

(11)    DAVID OSTROV,

(12)    YECHIEL SALZBERG,

(13)    ABRAHAM SHILIAN,

(14)    GAVRYEL SILVERSTEIN,

(15)    JOSEPH SUSKIND, and

(16)    ROBERT YADGAROV,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offenses, and any property traceable to such property.

384.    If any of the property described in paragraph 383, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of the defendants --

84

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in paragraph 383 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL

FOREPERSON

KAITLIN R. O'DONNELL
IAN J. STEARNS
ASSISTANT UNITED STATES ATTORNEYS

District of Massachusetts: April 28 , 2026
Returned into the District Court by the Grand Jurors and filed.

/s/Thomas F. Quinn  4/28/2026 @ 3:45pm

DEPUTY CLERK

85